IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

DEC 2 2 2020

JEFFREY P. COLWELL
CLERK

Civil Action No. _____
(To be supplied by the court)

Estifanos Daniel Ogbaselassie  A#:097938145  Pro Se , Applicant,

v.
William Barr - Attorney General U.S.
John Fabbricatore - ICE Denver field office director;
Chad Wolf - Secretary of D.H.S.; Johnny Choate - Warden et al., Respondent.
(Name of warden, superintendent, jailer, or other custodian)

*(Note: If you are attacking the validity of a state conviction or sentence and not the execution of your sentence, you must file an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. If you are attacking the validity of a judgment entered in a federal court, you must file a motion pursuant to 28 U.S.C. § 2255 in the federal court that entered the judgment.)*

---

## APPLICATION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2241

---

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

## A.   APPLICANT INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

Estifanos Daniel Ogbaselassie  Pro Se  A#097938145, 3130 North Oakland Street
(Applicant's name, prisoner identification number, and complete mailing address)

Aurora, CO 80010

*Indicate whether you are a prisoner or other confined person as follows: (check one)*

___ Pretrial detainee
___ Civilly committed detainee
_X_ Immigration detainee
___ Convicted and sentenced state prisoner
___ Convicted and sentenced federal prisoner
___ Other: (*Please explain*) _____

**B.   RESPONDENT INFORMATION**

Attorney General William Barr
U.S. Department of Justice
950 Pennsylvania Avenue. NW
Washington, D.C. 20530

ICE Denver field
Office Director
John Fabbricatore
Office of the General
Counsel U.S. Depart

(Respondent's name and complete mailing address)
Warden Johnny Choate
Geo Group Inc.
3130 N. Oakland St.
Aurora, CO 80010

U.S Attorney's Office
District of Colorado
1801 California St, ste #1600
Denver, CO. 80202

of Homeland Security
2707 Martin Luther King
ave. SE
Washington D.C. 205

**C.   STATEMENT OF CLAIMS**

*State clearly and concisely every claim you are asserting in this action. For each claim, specify the right that allegedly has been violated and all facts that support your claim. If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "C. STATEMENT OF CLAIMS."*

CLAIM ONE: <u>Petitioner is being detained indefinitely by Respondents (I.C.E.)</u>
<u>in violation of Zadvydas v. Davis, 533 U.S. 678, 701 (2001)</u>

Supporting facts:

See brief in support of Petition
for writ of hebeas corpus attached herein.

**D.   PRIOR APPLICATIONS**

Have you ever filed a lawsuit, other than this lawsuit, in any federal court in which you raised or could have raised the claim(s) raised in this action? ___ Yes  _X_ No (*check one*).

*If your answer is "Yes," complete this section of the form.  If you have filed more than one prior application, use additional paper to provide the requested information for each prior application.  Please indicate that additional paper is attached and label the additional pages regarding previous lawsuits as "D. PRIOR APPLICATIONS."*

Name and location of court:                 _____

Case number:                                        _____

Type of proceeding:                              _____

List the claim(s) raised:                        _____

Date and result: (Attach a copy of        _____
the decision if available)

Result on appeal, if appealed:             _____

**E.   ADMINISTRATIVE REMEDIES**

*WARNING: You must exhaust administrative and/or state remedies before filing an action in federal court pursuant to 28 U.S.C. § 2241.  Your case may be dismissed if you have not exhausted administrative and/or state remedies.  If additional space is needed to explain exhaustion, use extra paper to do so.  Please indicate that additional paper is attached and label the additional pages regarding exhaustion as "E. ADMINISTRATIVE REMEDIES."*

Explain the steps you have taken to exhaust administrative and/or state remedies:

See Brief in support of Petition for Writ of habeas corpus attached herein.

Petitioner exhausted all possible administrative remedies.

• Requested bond hearing at Immigration court and was told I was ineligeble.
• Had a 90 day post removal custody review on august 24, 2020 and was told that I would stay in detention.
• Had a 180 day post removal custody review on November 24, 2020 and was told that I would stay in detention.

**F.    REQUEST FOR RELIEF**

*State the relief you are requesting or what you want the court to do.  If additional space is needed*
*to identify the relief you are requesting, use extra paper to request relief.  Please indicate that*
*additional paper is attached and label the additional pages regarding relief as "F. REQUEST*
*FOR RELIEF."*

See Brief in support of Petition for Writ of habeas corpus
Attached herein.

**G.    APPLICANT'S SIGNATURE**

I declare under penalty of perjury that I am the applicant in this action, that I have read this
application, and that the information in this application is true and correct.  *See* 28 U.S.C. §
1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my
knowledge, information, and belief that this application: (1) is not being presented for an
improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of
litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or
modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so
identified, will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery; and (4) the application otherwise complies with the requirements of
Rule 11.

_____ Pro-Se
(Applicant's signature)

12-22-2020
(Date)

(Form Revised December 2017)

4

Petitioner, Estifanos Daniel Ogbaselassie; an Immigration detainee petitions this court for a writ of habeas corpus to remedy Petitioner Indefinite detention by Respondents.

## Jurisdiction and Venue

1.   This Court has subject matter jurisdiction and may grant relief under 28 U.S.C. §2241 (habeas corpus), 28 U.S.C. §1651 (All Writs Act), and 28 U.S.C. §1331 (Federal question). This Court also has jurisdiction to hear this case under the Suspension Clause of Article I of the United States Constitution. INS v. St. Cyr, 53: U.S. 289 (2001)

2. Because Petitioner challenges his ___ custody, jurisdiction is proper in this Court. While the courts of appeals have jurisdiction to review removal orders through petitions for review, see 8 U.S.C. §§1252(a)(1) and (b), the federal district courts have jurisdiction under 28 U.S.C. §2241 to hear habeas petitions by noncitizens challenging the lawfulness of their detention. See e.g., Zadvydas v. Davis, 533 U.S. 678, 687-88 (2001);

3.  Petitioner has exhausted all and any administrative remedies to the extent required by law.

4.  Venue is proper in the District of Colorado pursuant to 28 U.S.C. §§1391(b) and (e) because a substantial part of the events or omissions giving rise to these claims occurred in this district. All material decisions have been made at the Denver Field Office of Immigration and Customs Enforcement (ICE), which is located in this judicial district.

## Parties

5. Petitioner is a noncitizen who is currently detained by Immigration and Customs Enforcement (ICE) at the GEO Contracted Aurora ICE Processing Center in Aurora, CO.

6. Respondent Chad Wolf is the Secretary of the United States Department of Homeland Security. He is responsible for the implementation and enforcement of the Immigration laws and oversees ICE. As such, Respondent Wolf has ultimate custodial authority over Petitioner.

7. Respondent Johnny Choate is the Warden of the Immigration Detention Facility and is also a legal custodian of Petitioner.

8. All Respondents are sued in their official capacities.

9. Respondent John Fabbricatore is the head of the Denver ICE Field office

## Factual Allegations

9. Petitioner Estifanos Daniel Ogbaselassie was born in Ethiopia.

10. Petitioner entered the United States on or about July, 5, 2003 under a visitors visa at 7 years old. Petitioner recieved his Lawful Permanent Resident status in 2007.

10. Petitioner was convicted of Attempt to commit Second Degree Assault, and Second Degree Assault in the heat of passion in the Alamosa district court of Colorado on September 14, 2015. I was subsequently sentenced to 6 years and 2 years respectively in the Colorado Department of Corrections for those crimes. I was released from the CDOC on May 7, 2020 on early parole with a 2 year term of parole to serve. On may 7, 2020 I was immediately picked up by ICE following my release from C.D.O.C. On May 28, 2020 petitioner recieved a final removal order from an Immigration judge Steven Caley at the Executive Office for Immigration

3 of 7

_E. O._

Review' (EOIR) Aurora Immigration Court. (Exhibit A, attached)

11. Petitioner was detained by Immigration and Customs Enforcement on May, 7, 2020 as stated above. Petitioner has remained in ICE custody since that date.

12. An Immigration Judge ordered Petitioner removed from the United States on or about 5/28/2020. Petitioner DID NOT appeal the Immigration Judge's decision to the Board of Immigration Appeals.

13. Petitioner recieved a document titled "Decision to Continue Detention" from ICE on or about August 26, 2020. (Exhibit B) Petitioner filed several requests for a 180 day custody review with ICE HQ but recieved no review to this date. Petitioner also put in a DHS OIG complaint on 12/3/20 about not getting a 180 day review. (Exhibit C)

14. Petitioner has cooperated fully with all of ICE's efforts to remove Petitioner. Petitioner has filled out all needed forms and applications to obtain travel documents from the Ethiopian embassy. Petitioner has also done an interview with the Ethiopian embassy. During that interview petitioner was honest and forthcoming to assist in the process of recieving travel documents. Petitioner has also contacted his embassy, and has had his mother and father contact the embassy and talk to "Abebe" who is responsible for issuing travel documents. Collectively we have talked to "Abebe" over 20 times to try and convince him to issue me travel documents. He has told me and my family repeatedly that he has not been able to independently verify my Ethiopian citizenship.

15. Nonetheless, ICE has been unable to remove Petitioner from the United States. ICE is unlikely to be able to remove Petitioner because around September "Abebe" informed ICE that he did not have enough information to be able to verify my citizenship. ICE in turn

sent him my mothers personal Information to see if that would suffice to verify my nationality. In the three months since this last ditch effort by ICE there has still not been any travel documents issued to effectuate my removal On August 26, 2020 I was served a document by ICE (Exhibit B), that stated "ICE is in reciept of or expects to recieve the necessary travel documents to effectuate your removal, and removal is practicable, likely to occur in the reasonably forseeable future"..."There is significant likelyhood of recieving your travel document in the near future". That was the premise of extending my custody back in August. It is now December and there still has not been a materalization of these travel documents that ____ ICE was supposedly "In reciept of." Additionally in the begining of November a Civil war erupted in Ethiopia per multiple credible international news outlets. The war is between the federal government and the Tigray region which is home to the ethnic tigray people. That is my ethnicity (see Exhibit D) I have attached my fathers birth certificate as well as a notarized affidavit from him stating that he is Tigrey which in turn makes me Tigray. There is severe animosity between the Ethiopian government and the Tigray region, and there has been a blanket firing of all tigray govt. officials in Ethiopia and abroad by the Ethiopian ____ Prime minister I have attached reports about what is going on in Ethiopia (Exhibit E) The person in charge of issuing me travel documents was fired from his post in the Ethiopian embassy early november because he was ethnically tigray. There is an internal policy to not _ issue documents to allow ethnic tigrays to travel in or out of Ethiopia. With the 5½ months

of not bieng able to get travel documents to effectuate my removal, coupled with the last month of political turmoil, violence and descrimination that has erupted in Ethiopia I do not see any significant likelyhood of recieving travel documents to effectuate my removal in the forseeable future. The amount of difficulty that ICE has had for several months:

trying to convince the Ethiopian embassy to issue travel documents to be able to remove me was without the added hurdles of my ethnicity bieng targeted in multiple ways including travel bans; and an active civil war raging in Ethiopia. The Ethiopian embassy also states they do not issue citizenship documents without an original birth certificate which I do not have, and there is no feasible way for me to obtain one.

Legal Framework

16. In Zadvydas v. Davis, the Supreme Court held that immigration statute 8 U.S.C. §1231(a)(6) does not allow ICE to detain a noncitizen indefinetly while attempting to carry out removal. 533 U.S 678,689 (2001). Because of the "serious constitutional problem" posed by indefinite detention, the Court read the statute to limit a noncitizen's detention to "a period reasonably necessary to bring about that alien's removal from the United States." Id.

17. The Court also recognized six months as the "presumptively reasonable period" of post-removal order detention. Id. at 701. After six months, once the noncitizen provides "good reason to believe that there is no significant likelihood of removal in the reasonably forseeable future," the burden shifts to the government to rebut that showing. Id. Moreover, "as the period of prior post-removal confinement grows, what counts as the 'reasonably

forseeable future. conversely would have to shrink." Id.

18. In Clark v. Martinez, the Supreme Court held that its ruling in Zadvydas applies equally to noncitizens who have never been admitted to the United States. 543 U.S 371 (2005)

19. In Anyimu v. Dept of Homeland Security the federal court held that no definitive reply from the embassy saying that they will issue travel documents was enought to prove that there was no significant likelyhood of Removal in the forseeable future.

## Claim for Relief
### Violation of The Immigration and Nationality Act

20. The foregoing allegations are realleged and incorporated herein.

21. Petitioner's continued detention is unlawful and violates 8 U.S.C. §1231(a)(6) as interpreted by the Supreme Court in Zadvydas. The six-month presumptively reasonable period of detention has expired and Petitioner has provided good reason to believe that his removal is not significantly likely to occur in the reasonably foreseeable future. Therefore, Respondents lack authority to continue detaining Petitioner.

## Prayer for Relief

WHEREFORE, Petitioner respectfully requests that the Court grant the following relief:

a. Assume jurisdiction over this matter;

7 of 7.

_E.O_

b. Issue an order pursuant to 28. U.S.C. § 2243 directing Respondents to show cause why the writ of habeas corpus should not be granted;

c. Grant the writ of habeas corpus and order Petitioner's immediate release from custody;

d. Grant any other and further relief as the Court deems just and proper.

e. Order Respondents to refrain from transferring the Petitioner out of the jurisdiction of this Court during the pendency of these proceedings.

Date: 12-22-2020          Signature: E_____ Pro-Se

                                   Petitioner

A3-206-2 [Exhibit A]



# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## AURORA IMMIGRATION COURT

| | |
|---|---|
| Respondent Name: | Alien Registration Number: |
| OGBASELASSIE, ESTIFANOS DANIEL | 097938145 |
| To: | Riders: |
| OGBASELASSIE, ESTIFANOS DANIEL | In Removal Proceedings |
| DHS/ICE GEO | Initiated by the Department of Homeland Security |
| 3130 N. OAKLAND ST | Date: |
| AURORA, CO 80010 | 05/28/2020 |

## ORDER OF THE IMMIGRATION JUDGE

☒ This is a summary of the oral decision entered on 05/29/2020.
The oral decision in this case is the official opinion, and the immigration court issued this summary for the convenience of the parties.

☒ Both parties waived the issuance of a formal oral decision in this proceeding.

### I. Removability

The immigration court found Respondent ☒ removable ☐ inadmissible under the following Section(s) of the Immigration and Nationality Act (INA):

### II. Applications for Relief

Respondent's application for:

A. Asylum/Withholding/Convention Against Torture
☐ Asylum was ☐granted ☐denied ☐withdrawn.
☐ Withholding of Removal under the INA was ☐granted ☐denied ☐withdrawn.
☐ Withholding of Removal under the Convention Against Torture was ☐granted ☐denied ☐withdrawn.
☐ Deferral of Removal under the Convention Against Torture was ☐granted ☐denied ☐withdrawn.
☐ Respondent knowingly filed a frivolous application for asylum after notice of the consequences.

B. Cancellation of Removal
☐ Cancellation of Removal for Lawful Permanent Residents under INA § 240A(a) was
☐granted ☐denied ☐withdrawn.
☐ Cancellation of Removal for Nonpermanent Residents under INA § 240A(b)(1) was
☐granted ☐denied ☐withdrawn.
☐ Special Rule Cancellation of Removal under INA § 240A(b)(2) was
☐granted ☐denied ☐withdrawn.

C. Waiver
☐ A waiver under INA §       was ☐granted ☐denied ☐withdrawn.

A2 - 206-2

D.  Adjustment of Status

☐ Adjustment of Status under under INA §        was ☐granted ☐denied ☐withdrawn.

E.  Other

### III.   Voluntary Departure

☐ Respondent's application for ☐ pre-conclusion ☐ post-conclusion voluntary departure was
☐granted ☐denied ☐withdrawn.

☐ Further information regarding voluntary departure is attached.

### IV.   Removal

☒ Respondent was ordered removed to  Ethiopia.

☐ In the alternative, Respondent was ordered removed to

### V.   Other

☐ Proceedings were ☐ terminated ☐ administratively closed.

☐ Respondent was advised of the limitation on discretionary relief for failure to appear as ordered.

☐ Respondent's status was rescinded under INA § 246.

☐ Other:

Immigration Judge: Caley, Steven  05/28/2020

Appeal:   Department of Homeland Security: ☒ waived   ☐ reserved
          Respondent: ☒ waived   ☐ reserved

Appeal Due:

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service

To: [ ] Alien | [P ] Alien c/o custodial officer | [ ] Alien's atty/rep. | [ P ] DHS

By: Lubchenco, Kendra , Court Staff

Date: 05/28/2020

Exhibit B2

*Office of Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
12445 E Caley Ave
Centennial, CO 80111



U.S. Immigration
and Customs
Enforcement

OGBASELASSIE, Estifanos Daniel                                    A097 938 145
c/o Immigration and Customs Enforcement
Denver Field Office

## Decision to Continue Detention

This letter is to inform you that your custody status has been reviewed, and it has been
determined that you will not be released from the custody of U.S. Immigration and Customs
Enforcement (ICE) at this time. This decision has been made based on a review of your file,
consideration of the information you submitted to ICE's reviewing officials on 08/25/2020, and
upon review of the factors for consideration set forth at 8 C.F.R. § 241.4(e), (f), and (g).

As explained below, after such review, ICE has determined to maintain your custody because:

- ICE is in receipt of or expects to receive the necessary travel documents to effectuate
  your removal, and removal is practicable, likely to occur in the reasonably foreseeable
  future, and in the public interest.

ICE has made such determination based upon:

- There is significant likelihood of receiving your travel document in the near future and
  you have an assaultive and egregious criminal record.

Based on the above, you are to remain in ICE custody pending your removal from the United
States as ICE is unable to conclude that the factors set forth at 8 C.F.R. § 241.4(e) have been
satisfied. You are advised that you must demonstrate that you are making reasonable efforts to
comply with the order of removal and that you are cooperating with ICE's efforts to remove you
by taking whatever actions ICE requests to affect your removal. You are also advised that any
willful failure or refusal on your part to make timely application in good faith for travel or other
documents necessary for your departure, or any conspiracy or actions to prevent your removal or
obstruct the issuance of a travel document, may subject you to criminal prosecution under 8
U.S.C. § 1253(a).

If you have not been released or removed from the United States at the expiration of the three-
month period after this 90-day review, jurisdiction of the custody decision in your case will be
transferred to the ICE Headquarters (ERO Removal Division), Potomac Center North, 500 12th
Street SW, Washington, DC 20536. The ERO Removal Division will thereafter conduct a

**Decision to Continue Detention**
OGBASELASSIE, Estifanos A# 097 938 145
Page 2

custody review and will make a determination regarding whether you will continue to be detained pending removal or may be released.

To assist in the ERO Removal Division custody review, you will be afforded a personal interview. You and your representative who has filed a Form G-28, Notice of Entry of Appearance, if any, will be notified of the date and time of the interview approximately 30 days prior to the scheduled interview date. This interview may be in person or through a video teleconference. If ERO needs to change the date of the interview, ERO will provide notice to you and your representative who has filed a Form G-28, Notice of Entry of Appearance, if any.

You may be accompanied during the interview by a person of your choice, subject to security requirements at the detention facility, as long as this person is able to attend the interview at the scheduled time.

You may submit any additional documentation in English you wish to be considered in support of your release at the time of the interview or via mail service up to five business days prior to the scheduled time of your interview to the following address:

**ICE/ERO Aurora, Colorado**
**3130 N. Oakland Street**
**Aurora, CO 80010**

Such documentation should contain a cover letter indicating that the material is submitted in support of your Post Order Custody Review personal interview. An attorney or other person may submit materials on your behalf.

You are required to complete the below information.

**I do____ do not____ want a personal interview.**

**If you do want an interview, please check the appropriate box(es) below:**

☐   Check this box if you need an interpreter for your interview.
     Language/Dialect: _____

☐   I will be assisted at this interview by a representative of my own choosing.

     Name:_____

If your representative has not filed a G-28, Notice of Entry of Appearance, on your behalf, you are responsible for notifying any other person you have selected to assist you of the date, time, and location of the interview. The representative must be at least 18 years of age.

**Decision to Continue Detention**
OGBASELASSIE, Estifanos A# 097 938 145
Page 3

You will be sent a separate Notice to Alien of Interview for Review of Custody Status approximately 30 days before the interview is scheduled  If you wish to request additional time to prepare for the interview, you must notify your deportation officer within five business days of receipt of the Notice of Interview.  If ERO agrees to postpone the interview at your request, you will be deemed to have waived its completion prior to jurisdiction over your case transferring to the ERO Removal Division.

You will be notified of the decision in your case when the custody review has been concluded by the ERO Removal Division.

Michael Anderson _____                    8/24/2020
Deputy Field Office Director                                               Date

═══════════════════════════════════════════════════════════

**PROOF OF SERVICE**

**(Officer to complete both (a) and (b) below.)**

    (a)   I _____P. Bell #8880_____, _____D.O._____,
                  Name of ICE Officer         Title
certify that I served ___Ogbaselassie, Estifanos A# 097 938 145___ with a copy of
                        Name of detainee
this document at ___GEO Aurora, Colorado___ on 8/25/2020 at _____
                  Institution          Date       Time

    (b)   I certify that I served the custodian _____,
                                 Name of Official
_____, at _____, on
      Title                         Institution
_____ with a copy of this document.
      Date

Detainee Signature:_____  Date: _____

( ) cc: Attorney of Record or Designated Representative
(xx) cc: A-File

Exhibit C also goes to show my multiple efforts to exhaust any administrative remedies that were available to me. As well as my attempts to inquire about my case which were largely ignored by ICE. I have been in near constant communication with my Embassy as these Dated kites show, as well as communicating any responses that I am recieving from my embassy with ICE to try and expediate my case. ICE has not showed me any significant efforts or progress that they have made towards recieving my travel documents, they only give abstract half truths and deflect my questions. They have not recieved anything official from the Ethropian Government giving me or promising to give me travel documents in the forseeable future.

Estifanos Daniel Ogbasdassie

Date: 12/11/20      X _____

Exhibit C

*Office of Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

 **U.S. Immigration
and Customs
Enforcement**

OGBASELASSIE, Estifanos Daniel                                A097 938 145
C/O Immigration and Customs Enforcement
Denver Field Office

## Decision to Continue Detention

This letter is to inform you that the U.S. Immigration and Customs Enforcement (ICE) has reviewed your custody status and determined that you will not be released from custody at this time. This decision was based on a review of your file record, personal interview and consideration of any information you submitted to ICE reviewing officials and upon review of the factors for consideration set forth at 8 C.F.R. § 241.4(e), (f), and (g).

You are a native and citizen of Ethiopia who last entered the United States on July 5, 2003 as a non-immigrant. You have been convicted for the crimes of Assault – Cause Injury with Deadly Weapon and Assault – Cause Serious Bodily Injury – Heat of Passion. On May 28, 2020, you were issued an Order of Removal by an Immigration Judge.

ICE is currently working with the Government of Ethiopia to secure a travel document for your removal from the United States. A travel document from the Government of Ethiopia is expected, and ICE has reason to believe there is a significant likelihood that your removal will occur in the reasonably foreseeable future. Therefore, you are to remain in ICE custody at this time, as ICE is unable to conclude that the factors set forth at 8 C.F.R. § 241.4(e) have been satisfied.

This decision, however, does not preclude you from bringing forth evidence in the future to demonstrate a good reason why your removal is unlikely. You are advised that pursuant to Section 241(a)(1)(C) of the Immigration and Nationality Act (INA) you must demonstrate that you are making reasonable efforts to comply with the order of removal, and that you are cooperating with ICE efforts to remove you by taking whatever actions ICE requests to affect your removal.

You are also advised that any willful failure or refusal on your part to make timely application in good faith for travel or other documents necessary for your departure, or any conspiracy or actions to prevent your removal or obstruct the issuance of a travel document, may subject you to criminal prosecution under 8 USC § 1253(a).

Heath Simon          *Heath Simon*                              December 8, 2020
HQ RIO Chief                                                    Date

Exhibit C

This is my official request to ICE using the detainee request system asking what is going on with my travel documents. Officer Bell responded by saying he has not heard anything yet, and he can't contact my embassy.

## AURORA PROCESSING CENTER (REQUEST FORM - KITE)

Name: Estilano D. Oubouglosse Chingalea

Nationality: A3 Noh

Housing Unit: A3 Noh

Date: 7/22/2020

ID #: 9935845

Officer Signature: (signature)

TIME/DATE STAMP: 1200 07-22-2020

### MARK YOUR REQUEST / MARQUE SU PEDIMENTO

- [X] ICE / INMIGRACIÓN
- [ ] COURT / CORTE
- [ ] LIBRARY / BIBLIOTECA
- [ ] PHONE CALL / LLAMADAS TELEFÓNICAS
- [ ] CASE MANAGER - MARSHAL SERVICE

Telephone number/Número de teléfono

Other Request:

What is going on with my travel documents Is there any reply from the embassy because they do not answer the phone for me. Thank you.

Bell

RESPONSE:

I still have yet to hear anything from my point of contact in washington D.C. so I must wait, because not even I can contact the embassy directly. Bell

Completed YES [X] NO [ ]   BY:   DATE: 8/5/2020

Exhibit C

This is me again inquiring about why my embassy is saying to me and my family that they can't issue me travel documents but I am still bieng held after my 90 day review.

# AURORA PROCESSING CENTER (REQUEST FORM - KITE)

Name: Zitfinos D. Gybaxlasse          Nationality: Ethiopia          ID #: 979 3845

Housing Unit: A5 F1          Date: 9-1-2020          Officer Signature: Goodpace

Telephone number/Número de teléfono

## MARK YOUR REQUEST

- ☑ ICE
- ☐ COURT
- ☐ LIBRARY
- ☐ PHONE CALL
- ☐ CASE MANAGER - MARSHAL SERVICE

## MARQUE SU PEDIMENTO

- ☐ INMIGRACIÓN
- ☐ CORTE
- ☐ BIBLIOTECA
- ☐ LLAMADAS TELEFÓNICAS

Other Request: My mother was informed today by the ethiopian embassy that they have informed ICE that they will not be able to issue me travel documents because they do not recognize me as a citizen. Can you please verify that with your point of contact in DC so that my release can start being processed.

ICE Supervisor or BELL

**RESPONSE:** There telling your mother is not telling you. Same as them telling my counterpart in washington. I will reach out, but if he hasn't heard anything DC, thats just what it is.

Completed YES ☑ NO ☐          BY: Bell          DATE: 9/2/2020

Exhibit C

This is me requesting information as to the status of my travel documents, and also asking for what the communication has been with my embassy. ICE hasnot given me any specific information as to what my embassy has communicated to them or what ICE has requested from my embassy to date.

**AURORA PROCESSING CENTER (REQUEST FORM - KITE)**

CO-8-302-020
TIME/DATE STAMP

Name _Ephraim D. Abaaslassie_   Nationality _Ethiopian_   ID # _97938145_   Officer Signature _Bevis_

Housing Unit _F1 A-5_   Date _8/30/2020_

Telephone number/Número de teléfono

**MARK YOUR REQUEST**                    **MARQUE SU PEDIMENTO**

☒ ICE                   ☐ INMIGRACIÓN
☐ COURT                 ☐ CORTE
☐ LIBRARY               ☐ BIBLIOTECA
☐ PHONE CALL            ☐ LLAMADAS TELEFÓNICAS
☐ CASE MANAGER - MARSHAL SERVICE

Other Request: _BELL or ICE Supervisor_

I would like to know how many times ICE has contacted my embassy and formally requested or checked on the status of the issuance of my travel documents, and more specifically what dates were those requests/inquiries made and if any response were recieved.

**RESPONSE:** ICE here in Aurora, CO is not permitted to contact your Embassy directly, you were informed of that. Your TD request was submitted 4/16/2020, I have made contact with the officer in Washington, DC every 30 days or more since that date, your code is pending.

Completed YES ☒  NO ☐  BY: _Bell_  DATE: _9/2/2020_

This is me asking to speak to a supervisor because I am not able to get any straight answers from ICE about anything. I was told that is not possible.

Exhibit C

# AURORA PROCESSING CENTER (REQUEST FORM - KITE)

Name: Esteban D. Cabaclassie

Nationality: Ethiopian

ID #: 79738145

Officer Signature: Raers

Housing Unit: F1 A-5

Date: 8/30/2020

TIME/DATE STAMP: [1:12:00?] 08/30/2020

## MARK YOUR REQUEST / MARQUE SU PEDIMENTO

| | |
|---|---|
| ☐ ICE | ☐ INMIGRACIÓN |
| ☐ COURT | ☐ CORTE |
| ☐ LIBRARY | ☐ BIBLIOTECA |
| ☐ PHONE CALL | ☐ LLAMADAS TELEFÓNICAS |
| ☐ CASE MANAGER - MARSHAL SERVICE | |

Telephone number/Número de teléfono

**Other Request:** I would like to speak to an ICE supervisor and to whoever signs off on the custody determinations. Namely; michael Anderson Deputy Field office director. Thank you

**RESPONSE:** That Person is not located in this building. You would never see Mr. Anderson.

Completed YES ☒   NO ☐   BY: Budd   DATE: 9/2/2020

EXHIBIT E2

This is me requesting to talk to a supervisor as to why I can't get an answer to my questions. I did not get to talk to any supervisor and recieved a puzzling reply to my request on paper as you can see

---

**AURORA PROCESSING CENTER (REQUEST FORM - KITE)**

Name: Eliheos D Gbaselassie Ethiopian

Housing Unit: A5 E1

Date: 9/2/2020

Nationality: Ethiopian

Officer Signature: ICE Supervisor

ID #: 9793845

TIME/DATE STAMP: 2100 09/02/20

**MARK YOUR REQUEST** / **MARQUE SU PEDIMENTO**

- ☒ ICE / INMIGRACIÓN ☐
- ☐ COURT / CORTE ☐
- ☐ LIBRARY / BIBLIOTECA ☐
- ☐ PHONE CALL / LLAMADAS TELEFÓNICAS ☐
- ☐ CASE MANAGER - MARSHAL SERVICE

Telephone number/Numero de teléfono

Other Request:

I was told when I called the ICE Detainee call center that the Ethiopian embassy Informed ICE that they would not be issuing me any travel documents. I please talk to an ICE supervisor to understand how that affects my custody. Because I was told by ICE that after my 91 days if the embassy says they won't issue travel docs I would be released ASAP.

Thank you.

RESPONSE: Duplicate

Completed YES ☒ NO ☐

BY: Bell

DATE: 9/4/2020

Exhibit C

This is a detainee request in which I inquired why my embassy is saying they won't issue me travel documents but my ICE officer in colorado is not letting me know that. ICE officer Bell responded that the embassy told ICE HQ that they could not issue documents with the information given to them. Because they can't confirm my citizenship independently. He told me we would know more in the coming weeks. It has been over 3 months since the ICE officer told me this.

## AURORA PROCESSING CENTER (REQUEST FORM - KITE)

Name: Elias D. Afarassie   Nationality: Ethiopian   ID #: 2143845   Officer Signature: [signature] Bell   FU 4:3:20   TIME/DATE STAMP

Housing Unit: A5 F1   Date: 9/3/2020

### MARK YOUR REQUEST / MARQUE SU PEDIMENTO

| | |
|---|---|
| ☒ ICE | ☐ INMIGRACIÓN |
| ☐ COURT | ☐ CORTE |
| ☐ LIBRARY | ☐ BIBLIOTECA |
| ☐ PHONE CALL | ☐ LLAMADAS TELEFÓNICAS |
| ☐ CASE MANAGER - MARSHAL SERVICE | |

Telephone number/Número de teléfono

Other Request:

I appreciate you responding to my kites quickly and answering my questions the best you can. I am but confused because The Ethiopian Embassy has told my family that they already communicated they do not want to issue travel documents "come to your counterpart in washington DC and that communication was confirmed to me that the ICE detainee call center that requirement. why I have trouble understanding why I am trying to figure out. Thank you. that yet
(more) in the coming weeks. [signature] Bell

### RESPONSE:

I have spoken to the ICE contact in washington DC. He states the ICE & detainee call center That the embassy says they require additional evidence. We are waiting for more information to arrive. we should know where breakdown in communication is.

Completed YES ☒   NO ☐   BY: [signature] Bell   DATE: 9/4/2020

Exhibit C

This is an inmate request that I
submitted to ICE in September asking
why I am bieng held when the Ethiopian
embassy told ICE HQ that the can't issue
me travel docs. because they can't verify
my nationality independently. ICE offker Bell
Came in the unit and told me he would get
back to me with more information but never did.

---

**AURORA PROCESSING CENTER (REQUEST FORM - KITE)**

Name  Eskинaus D. Ghasahssie   Nationality  Ethiopian   ID #  9798145

Housing Unit  AS F-1   Date  9/4/2020   Officer Signature  Bell

**MARK YOUR REQUEST**                    **MARQUE SU PEDIMENTO**

☒ ICE                 ☐ INMIGRACIÓN
☐ COURT               ☐ CORTE
☐ LIBRARY             ☐ BIBLIOTECA
☐ PHONE CALL          ☐ LLAMADAS TELEFÓNICAS
☐ CASE MANAGER - MARSHAL SERVICE

Telephone number/Número de teléfono

**Other Request:**
The Ethiopian embassy said they informed
their ICE contact whose name is
Noah N. Adams that they were not
willing to issue me travel
documents. Can you check with that
person to verify that. Thank you

**RESPONSE:**

I spoke to you in the
this morning.   Dorm

Completed YES ☒ NO ☐   BY: Bell   DATE: 9/10/2020

TIME/DATE STAMP  2222 07/06/20

Exhibit C

This is me again trying to figure out
why ICE told me that they had my travel
documents when that was a blatant
mistruth. They did not have any travel
documents. In fact my embassy told me
that they still were not willing to issue
me any documents. I did not recieve any
adequate answer in person or on paper.

## AURORA PROCESSING CENTER (REQUEST FORM - KITE)

Name Esubom D. Olawalasie
Nationality Ethiopian
Date 11/7/2020
ID # 97937245
Officer Signature Ponce #ICE*

Housing Unit A1 South
Telephone number/Numero de teléfono

TIME/DATE STAMP
11-7
12:55

### MARK YOUR REQUEST / MARQUE SU PEDIMENTO

- [X] ICE / INMIGRACION
- [ ] COURT / CORTE
- [ ] LIBRARY / BIBLIOTECA
- [ ] PHONE CALL / LLAMADAS TELEFÓNICAS
- [ ] CASE MANAGER - MARSHAL SERVICE

Other Request:
I have talked to my embassy multiple
times and my family has also, since I
was informed that a money order has
been sent to them for my TD. They
are informing me that they have not
said they will issue me a TD and
they have no intention of issuing
me a travel document. I am trying to
figure out where the miscommunication
is ~~between~~ and I would like to talk to
a supervisor to figure out where ICE
is with my Travel Documents because
as I said before my embassy said they
are not planning on issuing me one and
my 180 days are up in 2 weeks.

RESPONSE:
Spoke to you today

Completed YES [X]    NO [ ]    BY: Lindsey

DATE: 11-7 ile/20

Exhibit C

This is me again requesting to have information as to the "communications" that ICE has had with my embassy so that I can have an understanding of what progress is bieng made by ICE to get travel documents. I did not recieve any answer to this question in person and recieved a less that adequate reply on paper as you can see

## AURORA PROCESSING CENTER (REQUEST FORM - KITE)

Name: Ethanos D Ogbaslasse
Housing Unit: A1 South
Nationality: Ethiopia
Date: 11/7/2020
Officer Signature
ID #: 2793815
TIME/DATE STAMP: 11-7 1225

### MARK YOUR REQUEST / MARQUE SU PEDIMENTO

- ☑ ICE / INMIGRACION
- ☐ COURT / CORTE
- ☐ LIBRARY / BIBLIOTECA
- ☐ PHONE CALL / LLAMADAS TELEFÓNICAS
- ☐ CASE MANAGER - MARSHAL SERVICE

Telephone number/Numero de teléfono

Other Request * ICE *

chronological report of what my embassy has told you guys regarding my travel documents and the efforts that have been taken so far to get my I.D. My 180 days are in 2 weeks and I would like to have an accurate accounting of the efforts and responses that have been going on regarding my TD. I would like this so that if there is a decision to continue my detention further I can use that info to file my habeas corpus petition. Thank you.

RESPONSE: Spoke to you today

Completed YES ☑ NO ☐ BY: [signature]
DATE:

Exhibit C

This is me requesting to have someone go over my A-file or parts of it with me so that I can know what is going on in my case. I asked this because my Embassy and ICE were telling me opposite things and I could not get anything from either party on paper.

## AURORA PROCESSING CENTER (REQUEST FORM - KITE)

Name Estifanos D. Oqbaselassie E. thiopian
Nationality

Housing Unit A South    Date 11/8/2020

ID # 97983445

Officer Signature

TIME/DATE STAMP    11-8-20    8:15

### MARK YOUR REQUEST / MARQUE SU PEDIMENTO

☒ ICE / INMIGRACIÓN
☐ COURT / CORTE
☐ LIBRARY / BIBLIOTECA
☐ PHONE CALL / LLAMADAS TELEFÓNICAS
☐ CASE MANAGER - MARSHAL SERVICE

Telephone number/Número de teléfono

Other Request:

*ICE* Supervisor

Can I please have someone go over my A-File with me or give me a copy of it. I would also like to speak to a supervisor about my case. Thank you

RESPONSE:

Spoke to you today

Completed YES ☒   NO ☐   BY: Lindsey   DATE: 11/16/20

This is yet another inquiry that I submitted to find out what is going on with my travel documents

Exhibit-C

# AURORA PROCESSING CENTER (REQUEST FORM - KITE)

TIME/DATE STAMP
6/6 11:30

Name: Estfanos D Ogbaslassie

Nationality: Ethiopian

ID #: 99308145

Officer Signature: Ofc. Kettle

Housing Unit: A1K4

Date: 10/1/2020

## MARK YOUR REQUEST / MARQUE SU PEDIMENTO

- ☑ ICE / INMIGRACIÓN
- ☐ COURT / CORTE
- ☐ LIBRARY / BIBLIOTECA
- ☐ PHONE CALL / LLAMADAS TELEFÓNICAS
- ☐ CASE MANAGER - MARSHAL SERVICE

Telephone number/Número de teléfono

A - A - South

Other Request:

Can you please ask the DDO officer in Washington to ask my embassy if they have come up with a decision regarding my travel docs. I called the embassy and they said that they are waiting on your call. Thank you.

**RESPONSE:**

I looked back into your travel document case and your pending. HQ in Washington DC. is the one that contacts your embassy.

Completed YES ☐   NO ☐   BY: Kettle

DATE: 10/6/2020

This is an official detainee request form that I submitted to ICE requesting my 180 review document to continue detention. This is one of three kites I have submitted but I only got this one back with a reply thus far.

Exhibit C

## AURORA PROCESSING CENTER (REQUEST FORM - KITE)

ID # 697958145

TIME/DATE STAMP
11:27

Name: Estanios Ogbazghie    Date: 11/27/2020    Nationality: Ethiopia    Officer Signature

Housing Unit: A1 South

Telephone number/Número de teléfono

### MARK YOUR REQUEST

- [X] ICE
- [ ] COURT
- [ ] LIBRARY
- [ ] PHONE CALL
- [ ] CASE MANAGER - MARSHAL SERVICE

### MARQUE SU PEDIMENTO

- [ ] INMIGRACIÓN
- [ ] CORTE
- [ ] BIBLIOTECA
- [ ] LLAMADAS TELEFÓNICAS

Other Request: Can I please get my 180 day custody review paper. I need it for my habeas corpus

ICE

### RESPONSE:

We have not received it from HQ. When we get a copy you will get a copy

Completed YES [X]    NO [ ]    BY: Kinsey    DATE: 12/1/20

ICE Officer

‹11/27› • Exhibit-C

This is a letter I sent out to
ICE HQ on 11/27/2020 requesting
my 180 day review and I have
not recieved a reply or a paper
letting me know that they reviewed
my case. My 180 day mark was
on 11/23/2020 which is when I was
supposed to get a decision from
HQ per ICE policy.

Headquarters-Post-Order Detention Unit
US Dept. Homeland Security
Immigration and Customs Enforcement
801 I Street, N.W., Suite 900
Washington, D.C. 20536

Strauss V. Uyazaseiassic
#: 047-930-145
Denver Contract ICE processing center
3130 N. Oakland street
Aurora, CO 80010

Exhibit C

From: Estifanos D. Ogbaselassie
A#: 097-938-145
Denver GEO Contract ICE
Processing Center
3130 N. Oakland street
Aurora, CO 80010
November, 27 2020

To: Headquarters Post-Order
Detention Unit
US Department of Homeland Sec___
Immigration and Customs Enforcem___
801 I street, N.W. Suite 9__
Washington, D.C. 20536

I request ICE review my custody status while taking the following information into consideration, because I believe I qualify for release under an order of supervision. I am requesting that my custody be reviewed under the Zadvydas standard. I have been in detention for more than 180 days without recieving a 180 day review of my custody after my removal order became final. It is unlikely that I will be deported to Ethiopia in the reasonably foreseeable future. I am not a danger to public safety, and nor am I a flight risk. I entered the United States on or about 7/5/2003. My home country will not accept my deportation, because the person in charge of issuing me travel documents in the Ethiopian embassy has told me and my family that he will not issue me travel documents because he does not have my original birth certificate and cannot independently verify my Ethiopian citizenship. There has also been a civil war that broke out in Ethiopia over the past month where the ethnicity that I am is not being allowed to enter or exit the country, because the Tigray people are at war with the federal govt.

I am not a danger to public safety because I am genuinely remorseful for my crimes that I commited as a teenager, and

Exhibit C

have taken multiple classes and theraputic/self help courses to change the way I think while I have been incarcerated. I have sent you guys a packet with copies of all of my certificates for completion of the courses. Also I recieved early release from the Colorado Dept. of Corrections based on their assesment that I have shown genuine change and no longer constitute a danger to public safety.

I am not a significant flight risk, because I will live at 1350 Quari street Aurora, CO 80011 with my parents. I have sent you guys a copy of the deed to that house. If released I will concentrate on working and supporting my family. I am prepared to comply with all restrictions imposed on me as part of my release. I am also going to be on parole which requires mandatory reporting or I will be sent back to prison to complete my sentence. That is a very strong incentive to be compliant and stay at the address I provided.

For these reasons, I respectfully request that I be released under an order of supervision so that I may join my family and stop being a financial burden to them or society.

Respectfully submitted,

Estifanos D. Ogbaselassie
A#: 097-938-145

P.S. I have attached additional copies of my sponsor/housing letter and identification of my sponsors and deed to the house I will be staying at

Dear Honorable Immigration Judge,

My name is Mikale Ogbaselassie, I am a U.S. citizen and resident of Aurora, Colorado where I also attend the University of Colorado. I am writing this letter in support of my brother, Estifanos Ogbaselassie. Estifanos is a permanent resident of the U.S. and has resided in Colorado since 2003, when our family relocated to the United States. I have known Estifanos for my entire life and he is my only sibling, so we are close. I attest that Estifanos is an individual of good character who made costly mistakes in the past and has learned from them. He has served his prison sentence and demonstrated his desire for self-improvement by taking college credit classes and participating in several other programs at Sterling Correctional Facility.

If Estifanos were to be removed from the United States, it would cause hardship to him and his family. His mother, father, and brother are all in Colorado, where we have established our lives during the last seventeen years. We are able to better support Estifanos and help him transition back into society if he is able to live with us in Colorado. Estifanos has the will to be successful wherever he ends up, however he has an extensive support system that he can lean on here in the U.S. In Ethiopia, Estifanos cannot rely on having the same kind of support for several reasons. Primarily, he is not familiar with anyone in Ethiopia and he will have trouble navigating a country which is foreign to him at this point. It will also be extremely difficult for Estifanos to seek employment in Ethiopia because he is proficient in speaking the language and cannot read or write.

I trust that you will consider permitting Estifanos Ogbaselassie stay with his family in the United States considering the circumstances. Thank you for your consideration.

Sincerely,


Mikale Ogbaselassie



UNITED STATES OF AMERICA

Type / Type / Tipo    Code / Code / Código    Passport No / No du Passeport / No de Pasaporte
P                     USA                      528230044

Surname / Nom / Apellidos
OGBASELASSIE

Given names / Prénoms / Nombres
MIKALE DANIEL

Nationality / Nationalité / Nacionalidad
UNITED STATES OF AMERICA

Date of birth / Date de naissance / Fecha de nacimiento
18 Aug 1997

Place of birth / Lieu de naissance / Lugar de nacimiento
ETHIOPIA

Date of issue / Date de délivrance / Fecha de expedición
18 Mar 2015

Date of expiration / Date d'expiration / Fecha de caducidad
17 Mar 2025

SEE PAGE 27

Sex / Sexe / Sexo    M

Authority / Autorité / Autoridad
United States
Department of State

USA

P<USAOGBASELASSIE<<MIKALE<DANIEL<<<<<<<<<<<<<
5282300448USA9708181M2503170172424840<686912



THE UNITED STATES OF AMERICA

No. 36679414

DEPARTMENT OF HOMELAND SECURITY

CERTIFICATE OF NATURALIZATION

*Personal description of holder as of date of naturalization:*

*Date of birth* **SEPTEMBER 27, 1969**

*Sex* **MALE**

*Height* **5** *feet* **4** *inches*

*Marital status:* **MARRIED**

*Country of former nationality:* **ETHIOPIA**

USCIS Registration No: **A094907143**

*I certify that the description given is true, and that the photograph affixed hereto is a likeness of me.*

(Complete and true signature of holder)

*Be it known that, pursuant to an application filed with the Secretary of Homeland Security,*

*at* CENTENNIAL COLORADO

DANIEL OGBASELASSIE GELAMICHAEL

AURORA, COLORADO

*The Secretary having found that:*

*residing at*

*having complied in all respects with all of the applicable provisions of the naturalization laws of the United States, being entitled to be admitted as a citizen of the United States, and having taken the oath of allegiance at a ceremony conducted by the*

U.S. CITIZENSHIP AND IMMIGRATION SERVICES

*at* CENTENNIAL COLORADO

*on* **JANUARY 29, 2015**

*such person is admitted as a citizen of the United States of America.*

U.S. Citizenship and Immigration Services

ALTERATION OR MISUSE OF THIS DOCUMENT IS A FEDERAL OFFENSE AND PUNISHABLE BY LAW

FORM N-550 (REV. 10/12)

BUREAU OF ENGRAVING AND PRINTING



Daniel Gelamichael
1350 Quari St.
Aurora, CO 80011

6

11

Arapahoe County Clerk & Recorder, Nancy A Doty
Reception #: B8089006
Receipt # 541761        Recording Fee: $6 00
Pages Recorded 1        Document Fee: $11 59
Date Recorded 8/6/2008 11 45 00 AM

SE

## SPECIAL WARRANTY DEED

THIS DEED, Made this _____ 8 _____ day of July, 2008 between

**Wells Fargo Bank, N.A., as Trsutee for Citigroup Mortgage Loan Trust, Series 2004-OPT1, Asset Backed Pass-Through Certificates**

of the County of Orange and State of California, grantor(s), and

**Daniel Gelamichael**

whose legal address is 1350 Quari Street Aurora, CO 80011

of the County of Arapahoe, State of Colorado, grantee(s)

WITNESS, That the grantor(s), for and in consideration of the sum of **One Hundred Fifteen Thousand Nine Hundred Dollars and NO/100's ($115,900.00)**, the receipt and sufficiency of which is hereby acknowledged, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell, convey and confirm, unto the grantee(s), his heirs and assigns forever, all the real property together with improvements, if any, situate, lying and being in the County of Arapahoe, State of COLORADO, described as follows

Lot 6, Block 9,
J.E. Roupp Second Addition,
Amended,
County of Arapahoe,
State of Colorado.

also known by street and number as   1350 Quari Street, Aurora, CO 80011

TOGETHER with all and singular the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim and demand whatsoever of the grantor(s), either in law or equity, of, in and to the above bargained premises, with the hereditaments and appurtenances.

TO HAVE AND TO HOLD the said premises above bargained and described, with the appurtenances, unto the grantee(s), his heirs, and assigns forever.  The grantor(s), for himself, his heirs and personal representatives or successors, does covenant and agree that he shall and will WARRANT AND FOREVER DEFEND the above-bargained premises in the quiet and peaceable possession of the grantee(s), his heirs and assigns, against all and every person or persons claiming the whole or any part thereof, by, through or under the grantor(s)

The singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders

IN WITNESS WHEREOF, the grantor(s) has executed this deed on the date set forth above

SELLER:
Wells Fargo Bank, N.A., as Trsutee for Citigroup Mortgage
Loan Trust, Series 2004-OPT1, Asset Backed Pass-Through
Certificates
By:

**Meredith Dinkel**
**Assistant Secretary**

Option One Mortgage Corporation as Attorney in Fact

STATE OF CALIFORNIA          }
COUNTY OF ORANGE             }          ss

The foregoing instrument was acknowledged, subscribed, and sworn before me this _____ 8 _____ day of July, 2008 by **Meredith Dinkel** as **Assistant Secretary** of Option One Mortgage Corporation as Attorney in Fact for Wells Fargo Bank, N.A., as Trsutee for Citigroup Mortgage Loan Trust, Series 2004-OPT1, Asset Backed Pass-Through Certificates.

(SEAL)

Sindi Sharbono
Notary Public

Witness my hand and official seal.
My Commission expires

SINDI SHARBONO
Commission # 1607228
Notary Public

*Exhibit D*

November 24, 2020

TO WHOME IT MAY CONCERN

I, Daniel Ogbaselassie Gelamichael, was born in Mekelle, the capital city of Tigray region, in Ethiopia. My ethnicity is Tigray which is now becoming the prime target of government sponsored extermination. According to Genocide Watch, Tigrayans are on stage 9 which is extermination stage due to government inaction. Estifanos Ogbaselassie is my son and he can be identified his Tigray ethnicity by his name. my birth certificate indicating my birthplace.

Sincerely,

Daniel Ogbaselassie Gelamichael

720 998 8092

danielwaye@yahoo.com

JACOB EMMANUEL PEREA
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20204030412
MY COMMISSION EXPIRES 09/01/2024

County/City of __Adams__
Commonwealth/State of __Colorado__
I certify this to be complete, full, true and
exact reproduction of the original document.

Ceritfied this __25th__ day of __11__, __2020__

Notary Public
My Commission Expires: __09/01/2024__

# APPENDIX H
## Sample Certificate of Translation

All submissions to the Immigration Court, if not in the English language, must be accompanied by a translation and certificate of translation   See Chapter 3 3(a) (Language)

---

### CERTIFICATE OF TRANSLATION

I, _____Azieb Weldeslase_____, am competent to translate from
   (name of translator)

_____Amharic_____ into English, and certify that the translation of
   (language)

1) Letter from Gofa Apartment Development Project.
2) Letter from Ethiopia Human Rights Commission.
   (names of documents)

is true and accurate to the best of my abilities

_____          Azieb Weldeslase
(signature of translator)               (typed/printed name of translator)

920 W Lakeside place   Chicago, IL 60640
(address of translator)

Apt. 1915
(address of translator)

312-723-0500
(telephone number of translator)

---

Exhibit E

በኢትዮጵያ ፌደራላዊ ዲሞክራሲያዊ ሪፐብሊክ
**Federal Democratic Republic of Ethiopia**

የኢትዮጵያ ሰብአዊ መብት ኮሚሽን
**ETHIOPIAN HUMAN RIGHTS COMMISSION**

This letter from the government sponsored human right is saying that there is ethnic profiling on the civil aviation to deny travel. It is widely reported including by international medias that Tigrayans are being harassed and denied flights due to their ethnicity.

Exhibit E

፳፯) እንዲሁም የዕስል መጠጠሪያዎች የአየርን የዕስር ግንነት የ፯ገባል ወይም በዱኔኒል መላሶ፣ በመጠጥ ሳግበት የዕስፍል በመሆኑ፣ ፫ህ ሳለ መመሪፎ ዘበፖ፣ አሳራ በፍቢያ አህን በአ፣ታዳዶ እተፊጠረው ገዛዶ ሁነት እንጀር፣ ዜ፳ፐ፣ በዕሌፍው ግነነተ በመአፖ፣ ስተርጣፊ እና መፍዳፐ (ethnic profiling) እነ፳ጋሰ፣ የማ፳፫ር፣ የፍፖፐኮ እ፳ነ፣ መ፣ነ፣ ፐ፫ፈ፣ፊሳ።

ስለሆነም ፫ህ ሁነት ፣ከከፍ ከፍ ባለስልጣኖ ፣ገ፳ፈ፣ው ስለ፫ ከተመሰለፖ፣ የአማ፳ሰ መ፣ለ፣ በፃ ፣ረ፣ አገ፣ር በ፳ማፊ በአ፣ታፐ ግ፣ሳ፣ሳጠ እነ፳ፈፈ፣ገ፣በ፣ ወይም ፣፣ፊ፣ ሁ፣ፐ፣ ፣ፈ፣ፐ ከ፣ስበ፣ መፊፐ፣ እ፳ር፣ ፣ፐማፊ፣፣ እ፳፳ታፈ፣ ፣፳ ፣ፊ፣ ግ፳ፊፐ፣ በስተፊፊፐ፣ እ፳ፈ፳ም፣ በ፳ህበፊ፣ እ፳ፐ፣፣ፈአ።



ከሰሳፖ፣ ፳ር

እነስል መስፊ(ፈሲ) የአ፳ታፈ፣ አስፊ መ፣ፈ፣ፈ፣ ፣ፐ በሮዘ፣ፊ

ግሰ፣ፈ፣
፩ ስለተፈ፣ ዐ፳ል አስ፣ ፳ስ፳
፪ እ፳ፈ፳ስ፣፣ፐ፣ አ፳፳ፊፈ
፫ ሰሳ፳ ፣ስ በ፣ፐ መፊ፳ፊ፳ፊፊ
   እ፳ሰ ፣ስ፣።

Ref. N₀: Name/4.19/1/201

Date: 01/-/2013

Tel: {unclear numbers}

Fax: (unclear)

P.O. Box: (unclear)

Email Address: (unclear)

**Addis Ababa**

Federal Democratic Republic of Ethiopia

Ethiopian Human Rights Commission

For the Ethiopian Civil Aviation Authority

For the Addis Ababa Bole Airport Security Office

Addis Ababa

Case  Since there is a need for additional ID card to a passport – guidance/ procedure

When Ethiopians who are travelling domestically or abroad need to use the Addis Ababa Bole Airport and approach the national landing station, claims to our commission show that in addition to the travelling passport, they are compelled to bring the given ID cards as the authority's new directive or procedure in practice. This new policy or procedure raises a question of human rights for two main reasons  to undergo appropriate adjustments or we urgently ask explanations on the state of the matter to convey clarity

1ˢᵗ) Passport in itself being a complete identification; besides, to the current knowledge in the city of Addis Ababa, the new residents digital ID process is temporarily halted and trying to issue the ID card by individual district creates distress  Also, this new policy can restrict the basic human right to travel.

{Signature}

{Space for Seal}

2nd) It has come to our attention that certain Kebele (District) ID Cards display individuals' ethnic identities or documents that make it easy to figure out using digital devices. This being a new rule or way of exertion is concerning as the current conditions in Ethiopia allow for suspicion and ethnic profiling against individuals.

Therefore, if this occurs, we kindly ask the authority to actively address the situation in light of the above-mentioned human rights concerns and provide adjustments in the earliest possible, or we respectfully request that you give us a full explanation of its relevance as soon as possible, so that we can corroborate with regard to the human right concerns.

|seal|                                    Best regards

                                            |Signature|

                                            Daniel Bakele

                                    Ethiopian Human rights Commission

                                            Chief Commissioner

Copy:

For the Attorney General Office.

Ministry of Transportation.

For Addis Ababa City Administration.

   Addis Ababa

Exhibit E

የኢትዮ ምዕራፍ፤ አፖርትመንት ግንባታ ፐርጀክት 17-05B
የመሰጠ ለውስጥ መገናየት

ቀን/Date_04_ቀነ /133/ም
ተ.ፐር/Ref.No TC/17-05B/ሪፈ.ሪ85 /13

ለኦኖ ስራ አስኪያጅ ጽ/ቤት

መ.ኮ.ኢ

ከ-ኢትዮ አፖርትመንት ግንባታ ፐርጀክት ምዕራፍ-ደ

(17-05B)

ጉዳዩ፦ ሰራተኞችን እረፍት ስለማግኘወጥ የመስከታል፦

በኩባ መጥ፤ በዞጋሪ... ከረደሰው መ.ፐርፈ. እኔንር ... ተመጀ፤ የሆነ
ሰራተኞች እንደ...ተ እንገዳወ በ... በ... ... መለረ፤ ከ... 05/03/13ኛ/ም
ፐርኮ ከ... ... በ... መለረ፤ ... በ... ... ... ...
እናገለዋ ...

| ተ.ቁ | ስም | የሰራ/መደብ | የፐር... |
|---|---|---|---|
| 1 | አበኒ... ... ... | የሰው/... ... ... | |
| 2 | ወ/ር... ... ... ... | ... ... ... || |
| 3 | አቶ ... ... | ... ... || |
| 4 | ... ... ... ... | ... ... ... ... | |
| 5 | ... ... ... | ... ... ... | |
| 6 | ... ... ... ... | ... ... ... || |
| 7 | ወ/ሮ... ... ... | ... ... ... | |
| 8 | ... ... ... | ... ... ... || |
| 9 | ... ... ... | ... ... ... | |
| 10 | ... ... ... ... | ... ... ... ... | |

ከሰላምታ ጋር

ግልባጭ፦

➢ ለፐ/ት ... ... ...
➢ ለፐ/ት ... ... ...
(17-05B) ፐርጀክት



Gofa apartment Tel. 018-896631/49   Head Office Tel 011442224/7077 Fax011442074/0114600471 P.O.Box
2414 e-mail DCEL@ethionet.at Kirkose Sub City Ke.04 Addis Ababa Ethiopia

Gofa's Chapter-2 Apartment Construction Project 17-05B

Internal Office Communication

Date: 11/13/2020

Ref No.: Pro/17-0 5BA4685 /13

To the Office of The General Manager
ME KO E.
From  Apartment Construction Project Chapter-2
(17-0 5B)

Case  Regarding Employee Vacation

From the knowledge of the current crisis in the Country, starting from tomorrow 11/14/2020, Tigray's indigenous

employees' names listed below are to take a leave, as given in the verbal order, and are informed to stay at home

| No | Name | Position | Investigation |
|----|------|----------|---------------|
| 1 | Lt /Co Ghebremeskel Abbay | Human Resources/ Management Staff | |
| 2 | Mrs  Rahel Weldegebriel | Site Engineer I | |
| 3 | Mr. Tekliet Haile | Site Engineer II | |
| 4 | Sha/Basha/Ghebreegziabher Asmahun | Easy vehicle driver | |
| 5 | Mr  Teklay Kiros | Easy vehicle driver | |
| 6 | Mr  Nassir MohammodBuhan | Civil Engineer II | |
| 7 | Mrs  Behafta Sherif | Damper operator | |
| 8 | Sha/L Tsegayu Weldu | Site Engineer II | |
| 9 | Mr  Hailu Sium | Loader operator | |
| 10 | Me/E Goitom Shishay | Industrial Electrician | |

Copy:
  Case Team for Project Office Engineering
  Case Team for Project Construction Engineer
  (17-05B) Project
    (Seal)

Best Regards
{seal}  {Signature}
Mrs  Mershaye Tekalign
Project Manager

Exhibit E

The above internal memorandum is written to let the government know that action is taken to forced leave Tigrayans from their job according to the oral direction given by government body



# FP

SIGN IN    **SUBSCRIBE**

**EXCLUSIVE**

# U.N. Fears Ethiopia Purging Ethnic Tigrayan Officers From Its Peacekeeping Missions

An internal United Nations document shows concern those troops could face torture or execution.

https://foreignpolicy.com/2020/11/23/un-ethiopia-purging-tigrayan-officers-peacekeeping-missions/?fbclid=IwAR1T7BgRCA67tGGIVXgRf27AIdKLWWDMcwPtG4f2b3AALJNqwkeoNehXPs8

The Ethiopian government has been rounding up ethnic Tigrayan security forces deployed in United Nations and African peacekeeping missions abroad and forcing them onto flights to the Ethiopian capital of Addis Ababa, where it is feared they may face torture or even execution, according to an internal U.N. account.

The moves come as Ethiopia is preparing a military offensive against the capital of the country's Tigray region, Mekelle. Conflict erupted earlier this month between federal and Tigrayan forces in the ethnically divided nation, which for decades was under de facto rule by the minority Tigrayans. The alarm inside the U.N. suggests that Ethiopia's Nobel Peace Prize-winning prime minister, Abiy Ahmed, may be expanding the country's weekslong conflict beyond the country's borders. It has alarmed human rights advocates and U.N. officials, who fear that the U.N. blue helmets may be persecuted upon their arrival back in Ethiopia.

The targeting of Tigrayan military officers in foreign peacekeeping and military operations comes amid rising fears that an Ethiopian government offensive against Tigrayan rebels inside Ethiopia could devolve into ethnic cleansing, with atrocities reported on both sides. The human rights watchdog Amnesty International recently issued a report detailing "the massacre of a very large number of civilians" in northern Ethiopia earlier this month, allegedly by groups loyal to the Tigrayan forces, in a grim harbinger of violence to come. Meanwhile, refugees fleeing the violence said they were targeted because they were Tigrayan.

In South Sudan earlier this month, Ethiopian soldiers disarmed a senior ethnic Ethiopian Tigrayan officer, escorted him to the capital of Juba, and forced him onto a Nov. 11 Ethiopian Airlines flight to Addis Ababa, according to the internal account, which was reviewed by *Foreign Policy*.

Ten days later, the Ethiopian contingent at the U.N. base in Juba reportedly detained three other Tigrayan officers. The officers, according to the internal account, "were coerced to take the Ethiopian Airlines flight from Juba to Addis Ababa. As of now their whereabouts are unknown."

The U.N. Mission in South Sudan, or UNMISS, "has become aware that three soldiers were repatriated back to their country on Saturday without the Mission's knowledge," a senior U.N. official at the mission said. "Our Human Rights Division is working to follow up on their situation."

"If there are any incidents where personnel are discriminated against or have their rights violated because of their ethnicity or they have concerns about their situation, this may involve a human rights violation under international law," the official added. "As a result, the UNMISS Human Rights Division is currently liaising with the Ethiopian peacekeeping command in South Sudan and has requested access to any contingent personnel who might, for any reason, be compelled to return home and be in need of protection."

The crackdown has spread to other African countries where Ethiopian peacekeepers and troops are deployed, including in Abyei, a disputed territory claimed by Sudan and South Sudan, and Somalia, where thousands of Ethiopian troops have been helping the government fight Islamist al-Shabab militants. As many as 40 Tigrayan officers and soldiers serving in the African Union Mission in Somalia have also been recalled to Ethiopia, according to one diplomatic source.

Exhibit E

At Ethiopia's U.N. mission in New York, the senior military attaché who oversaw peacekeeping issues, a Tigrayan, was fired after just months on the job, precipitating the purge of other Tigrayan officers from peacekeeping missions abroad, diplomatic sources said.

Ethiopia has seen deepening conflict between the country's Tigray minority—which accounts for just over 6 percent of the population but played a dominant role in Ethiopia's political life for decades, and whose status was reinforced under Meles Zenawi, an ethnic Tigrayan who served as prime minister and president of Ethiopia from 1991 until his death in August 2012—and the country's largest ethnic groups including the Amhara and Oromo, who account for more than 60 percent of the county's population.

Exhibit E



1:34

← Tweet

Awol Allo
@awol ...

Even ethnic Tigrayans in far away places are not spared Prosperity Party's vindictive campaign of against ethnic Tigrayans.

Ethiopia army accuses WHO boss Dr Tedros of supporting Tigray
bbc.co.uk

7:09 AM · 19 Nov 20 · Twitter Web

Tweet your reply



10.29 📹 🐦 📧 🎧 ⚡ 📧 ⚃ ⚄ ⋯ 📷📶 📶 92%🔋

← Tweet

**Gilbert Bouic**
@GilbertBouic

# Ethiopia practicing tribalism at UN level

😵 **Reuters Africa** ✓ @Reut... · 7h
Exclusive: Ethiopia says disarms Tigrayan peacekeepers in Somalia over security reut.rs/3nAAil0

9:03 PM · 18 Nov 20 · Twitter for Android

**46** Retweets  **33** Quote Tweets

**105** Likes

♡        �mt        ↱        ⚫

🍞 **Ethiopia** @Peace4Ethi... · 2h
Replying to @GilbertBouic

Tweet your reply                    📷

Exhibit 6

 **Martin Plaut**
@martinplaut

# Evidence of Ethiopia's purge of Tigrayans

 Evidence of Ethiopia's purge of Tigrayans - Eri...
eritreahub.org

5:39 AM · 14 Nov 20 · WordPress.com

**133** Retweets  **41** Quote Tweets

**244** Likes





**Following**

# Laetitia Bader ✔

@LaetitiaBader

Horn of Africa director at Human Rights Watch. Views my own, RT not automatically an endorsement.

Joined October 2011

**1,556** Following   **9,582** Followers

Followed by Litan Hailay Mela Haile, Samuel Getachew, and 16 others

Tweets    Tweets & replies    Media

Laetitia Bader ✔ @La... · 4h
And reports of harassment of ethnic Tigrayans and Tigrinya speaking people throughout the country also undermine these claims

William Davison ✔ ...

**The New York Times** | https://nyti.ms/3f0JiN7

 *See page 4 highlighted

 Exhibit E

# They Once Ruled Ethiopia. Now They Are Fighting Its Government.

Prime Minister Abiy Ahmed's two-year feud with the rebellious ruling party of the Tigray region has exploded into a war, with bombings, massacres and ethnic divisions, that threatens to upend the entire Horn of Africa.

**By Declan Walsh and Simon Marks**

Published Nov. 15, 2020 | Updated Nov. 26, 2020

NAIROBI, Kenya — When it comes to mountain warfare, the people of Tigray — an ancient kingdom in the far north of Ethiopia, spread across jagged peaks and lush farmland — have decades of hard-won experience.

Tigrayan fighters led a brutal war through the 1970s and '80s against a hated Marxist dictator of Ethiopia, whom they eventually toppled in 1991, becoming national heroes. For most of the next three decades, Tigrayans ruled Ethiopia.

But after Abiy Ahmed, a peace-talking young reformer, came to power as prime minister in 2018, he brusquely sidelined Tigray's leaders. Tensions exploded violently on Nov. 4, as the world was focused on the presidential election in the United States, when Mr. Abiy launched military strikes in Tigray.

Now Tigray is once again at war, fighting the federal government. But this time the risks could be even wider: the potential fracturing of Ethiopia and the upending of the entire Horn of Africa.

The battle pits the nation's army and Mr. Abiy, an internationally feted winner of the Nobel Peace Prize, against the ruling party of Tigray, which commands a large force of well-armed and experienced fighters who know their own mountain terrain well. Already the conflict has escalated at alarming speed with intense fighting that has involved airstrikes and artillery barrages, sent thousands of civilians fleeing across borders — some in boats or even swimming — and led to reports of civilian massacres.

With such intransigent foes, analysts predict a potentially long and bloody fight that is already spilling over Ethiopia's borders.



Although Ethiopia is one country, it contains 10 regions, many of them ethnic strongholds that have historically jostled for power. In moving so quickly to liberalize politics in 2018, Mr. Abiy may have inadvertently unleashed pent-up regional frustrations that had been simmering for decades.

Rivalries among ethnic groups like the Oromo, Amhara, Tigray and Somali burst into the open, leading to violent clashes that have increased in frequency and intensity this year, often killing scores of people. With Ethiopia's shaky federation straining badly, Tigray emerged at the vanguard of a movement pressing for greater autonomy for Ethiopia's regions.

Mr. Abiy, who started to imprison opponents, pushed for much tighter central control.

"Everyone saw this coming," said Kjetil Tronvoll, a scholar of Ethiopian politics at Bjorknes University College in Norway. "Both sides felt insecure and started to mobilize troops. It was a clear signal of a civil war in the making."

Mr. Abiy's speed in prosecuting the war has sent waves of alarm across the region and dismayed those who once lauded him as a peacemaker.

With phone and internet connections cut off, it's hard to know exactly what is happening in Tigray. But both sides agree that government warplanes have pounded targets around Mékelle, that some Ethiopian troops were pushed over the border into Eritrea and that the most intense fighting has raged in western Tigray. By Sunday at least 20,000 Ethiopian civilians had fled into Sudan, a refugee stream that the United Nations fears could quickly become a flood. Sudan says it is preparing for up to 200,000 refugees.

There have been accusations of war crimes against both sides, including a massacre reported by Amnesty International in which dozens of villagers were said to have been chopped to death with machetes, possibly by pro-Tigray militiamen.

People from the Tigray region waiting to register at a United Nations refugee center in Hamdayet, Sudan, on Saturday.  Marwan Ali/Associated Press

Mr. Abiy, who insists his dispute is with the ruling "clique" of Tigray, and not its people, has repeatedly promised a short campaign. Few experts believe that is likely. By some estimates, Tigray has 250,000 armed men, including special forces and militias. And its leaders, who have been anticipating this confrontation for more than a year, will not be easy to find.

Ethiopian officials say their immediate goal is to topple the rebellious Tigray authorities and capture their 12-person executive committee: a group of politicians, ideologues and security officials, many veterans of Tigray's last war in the 1980s.

One major target is Getachew Assefa, a Tigrayan hard-liner and former head of Ethiopia's intelligence service, who has been on the run since 2018, when Mr. Abiy's government issued a warrant for his arrest.

Case 1:20-cv-03761-RBJ   Document 1   Filed 12/22/20   USDC Colorado   Page 58 of 86

Waving Ethiopia's national flag at a blood-donation rally last week in Addis Ababa.  Eduardo Soteras/Agence France-Presse — Getty Images

But Woldegiorgis Teklay, a Tigrayan journalist whose office in Addis Ababa was raided last week, said he had since received numerous calls from Tigrayans whose relatives had been detained by the police because they speak Tigrinya, the language of Tigray.

As the conflict deepens, Mr. Abiy's reputation as a peacemaker has been undermined, and some Ethiopians have begun to blame the Nobel Prize committee for giving him that honor.

"The Nobel Prize protected Abiy," said Mr. Tronvoll, the academic, who called it "a shield that deflected a lot of criticism."

Declan Walsh reported from Nairobi, and Simon Marks from Addis Ababa, Ethiopia.

  

Exhibit E



DONATE

WORLD

# What To Know About Ethiopia's Tigray Conflict

November 13, 2020 · 9:40 AM ET

EYDER PERALTA



A man holds a national flag as he waits to donate blood in support of Ethiopia's military in Addis Ababa on Thursday. Rallies occurred in multiple cities in support of the government's military offensive against the Tigray People's Liberation Front.

*Mulugeta Ayene/AP*

For more than a week, Ethiopian government forces have been fighting against a powerful regional government in the country's north and hundreds are reported to

have died.

Prime Minister Abiy Ahmed, a Nobel Peace laureate, ordered the government offensive after accusing the rival Tigray People's Liberation Front of launching an attack against Ethiopia's military last week.

Thousands of people have been displaced, as government planes bomb targets in the Tigray region. The rhetoric is hardening on both sides of the conflict, raising fears it could escalate into a full-out civil war and destabilize an already fragile region.



**WORLD**

Ethiopia Edges Toward Civil War As Federal Government Orders Attack On Tigray Region

In a nightmare scenario, the conflict could pull in neighboring countries, including Sudan, which is working through a delicate transition of if its own, and Somalia, which is still fighting an Islamist insurgency.

Here are some key points to understand:

## How did this conflict start?

It has deep roots. But essentially, it's a power struggle that goes back to 2018, when a popular uprising brought Abiy to power.



**WORLD**

Nobel Peace Prize Goes To Ethiopia's Prime Minister Abiy Ahmed

He ushered in democratic reforms and negotiated an end to what had become a cold war with neighboring Eritrea. But he also dismantled Ethiopia's ruling party, the Ethiopian People's Revolutionary Democratic Front, which had run the country for almost 30 years.

The EPRDF, which appointed Abiy, was a coalition of ethnically based political parties. The Tigray People's Liberation Front dominated the coalition and had amassed a lot of power as an ethnic minority. Tigrayans make up about 6% of Ethiopia's population.



A member of the Tigray special forces casts his vote in a local election in the regional capital Mekelle, in the Tigray region of Ethiopia, on Sept. 9. The election took place in defiance of the federal government.
*AP*

When Abiy sidelined them, TPLF leaders retreated to their home region in northern Ethiopia. Since then, Abiy has accused them of trying to destabilize the country. In a briefing document sent to journalists on Thursday, his office directly accused the TPLF of orchestrating ethnic violence across the country.

"Hidden hands of the TPLF were there in the killings of civilians in many different parts of the country," the document read.

**AFRICA**

Nobel Peace Prize Winner Faces Protests After Activist's Late-Night Standoff



It cited intelligence, but didn't provide evidence. The TPLF has in the past denied similar accusations.

Regardless, that violence has displaced more than 3 million people over the past two years, according to the Internal Displacement Monitoring Centre.

But things worsened dramatically once COVID-19 hit Ethiopia, the African continent's second-largest country by population. Abiy was supposed to guide the country through its first truly democratic elections this summer. But citing the pandemic, he postponed them.

The TPLF argued that amounted to an unconstitutional extension of the federal government's term. So they defied Abiy's orders, created their own electoral commission and held their own regional elections. The federal government declared the Tigray elections unconstitutional and both sides began trading accusations of illegitimacy.

Abiy said the TPLF crossed a red line last week, when it allegedly organized a multi-pronged attack on the Ethiopian military's Northern Command — a "treason that will never be forgotten," Abiy said.



Abiy Ahmed is sworn in as Ethiopia's prime minister in April 2018.
*Mulugeta Ayene/AP*

The TPLF denied the attack. On its television station, after the fighting broke out, the region's president, Debretsion Gebremichael, called for dialogue. In a letter to the African Union, he accused the government of a power grab, and accused Abiy of imprisoning his opponents and trying to turn Ethiopia's ethnic federalism into a system where the prime minister holds all the power.

"Dr. Abiy Ahmed's one-man dictatorial regime has started to unravel the constitutionally-established state institutions," he wrote. "He is also endangering the unity of this ancient country."

## How serious is the fighting?

The internet and phone lines have been shut off in the conflict zone, so it has been a hard story to report. But things look grim. The Ethiopian military has said its forces have killed some 550 fighters.

Redwan Hussein, a spokesman for Ethiopia's State of Emergency Task Force, told a news conference he doesn't have exact numbers of casualties because forces are still trading fire. He says the communications blackout, for which he blames the TPLF, has affected even the government. So, he says, when the government takes control of territory, they will collect bodies and count.

On Thursday, Amnesty International said scores — likely hundreds — of apparent civilians were killed in a town at the western edge of the conflict. Amnesty said it hasn't been able to confirm who was responsible for the killings, that but witnesses told the group that TPLF-affiliated militias attacked with machetes, axes and knives. NPR has been unable to reach TPLF officials for comment.

The government is also bombing targets across the Tigray region and the United Nations' refugee agency says that some 7,000 Ethiopians fleeing the fighting have crossed the border into Sudan. The U.N. says that even before this conflict started, there were already about 96,000 Eritrean refugees and another 100,000 people who had been internally displaced in this part of Ethiopia.

"Roads are blocked and electricity, phone and internet are down, making communication nearly impossible," the agency said in its statement. "There is a shortage of fuel, and banking services have halted resulting in a lack of cash."

## Will the situation worsen?

This conflict has the potential to be devastating. Some scholars have warned Ethiopia could break apart in the way Yugoslavia did in the 1990s.

The government has downplayed the fighting, calling it a "law enforcement operation."

Kiya Tsegaye, an Ethiopian political analyst, says the government has alienated the TPLF from its neighbors. Abiy has made deals with Eritrea and the new government of

Sudan, leaving the TPLF with few ways to receive the weapons it would need to keep fighting.

But he says the TPLF is no ordinary militia.

"They have dominated the security and the military for almost three decades, and they have all the information and the top secrets of this country," he says. "They know the Achilles' heel."

The government alleges that when TPLF fighters attacked their troops last week, they also stole missiles that may be able to reach the capital Addis Ababa.

Another worry: an unstable Ethiopia could destabilize the region and perhaps even other parts of the country, which were already on edge.

One African diplomat, who follows Ethiopia closely and spoke on condition of anonymity to be able to speak candidly, says the warnings of a explosive conflict had existed for a while.

Just as Abiy came to power, a grenade was thrown his way at a public rally, and in late 2018, his own soldiers marched into his palace in an attempted coup. Everyone knew, the diplomat says, that this brew of ethnic states within Ethiopia, a government struggling with legitimacy and decades of built-up grievances could someday explode into war.

"Nobody seems surprised," the diplomat tells NPR. "But nobody seems to know what to do."

**Are there any signs that the two sides can come together?**

Not at the moment. The African Union has called for an immediate ceasefire. But Abiy has made it clear he will not negotiate until TPLF leaders are in custody and the cache of weapons held by the regional government is destroyed.

**Abiy won the Nobel Peace Prize. And now he is presiding over a brewing war?**

It's surprising. When he came to power, taxis and buses across Ethiopia plastered pictures of Abiy right next to those of Jesus. People on the streets said he had been sent by God.

Abiy was awarded the Nobel Peace Prize last year for his democratic reforms and for officially ending Ethiopia's war with Eritrea. In his acceptance speech, he railed against war. He himself fought in the Ethiopia-Eritrea war in the late 1990s, a war he described as the "epitome of hell."

"I've seen brothers slaughtering brothers on the battlefield," he said. "I have seen older men, women and children trembling in terror under the deadly shower of bullets and artillery shells. War makes for bitter men, heartless and savage men."

Now, just a year later, his jets are dropping bombs in some of the same places that war was waged.

Abiy, says Hussein, the government spokesman, is faced with a threat to the "very existence of the nation."

"The only thing he has to do is to defend it," he says. "So if there is a second Nobel Peace Prize, then he has to win it again, because he is still salvaging his country. He is still bringing hope to Ethiopians and defeating some terrorist gang leaders."

abiy ahmed      ethiopia

# More Stories From NPR



*Exhibit E*

DONATE           DO YOU NEED HELP?

# Pace of Ethiopian refugee arrivals in Sudan unseen in the last two decades

*This is a summary of what was said by UNHCR spokesperson Babar Baloch – to whom quoted text may be attributed – at today's press briefing at the Palais des Nations in Geneva.*

17 November 2020  |  Français  |  عربي



Ethiopian refugees cross the border into Hamdayet, Sudan, leaving the Tekeze River in the background.
© UNHCR/Hazim Elhag

UNHCR, the UN Refugee Agency, is warning that a full-scale humanitarian crisis is unfolding as thousands of refugees flee ongoing fighting in Ethiopia's Tigray region each day to seek safety in eastern Sudan – an influx unseen over the last two decades in this part of the country.

Women, men and children have been crossing the border at the rate of 4,000 per day since 10 November, rapidly overwhelming the humanitarian response capacity on the ground.

More than 27,000 have now crossed into Sudan through the Hamdayet border in Kassala State, the Lugdi in Gedaref State and a new location further south at Aderafi border where Ethiopian refugees started crossing over the weekend.

Refugees fleeing the fighting continue to arrive exhausted from the long trek to safety, with few belongings. UNHCR, with its partners, is supporting the Sudanese government in its response, ramping up humanitarian assistance at the borders as the needs continue to grow.

In Hamdayet, clean water is being delivered and latrines are being constructed. Soap is provided but UNHCR remains very concerned about the hygiene conditions as more and more people arrive.

At Village 8, the transit centre near the Lugdi crossing, refugees are able to access clean water in nearby communities and use 1,200 existing temporary shelters.

Humanitarian agencies continue to distribute relief items including blankets and sleeping mats. The World Food Programme is providing food and high protein biscuits. Hot meals are being provided by Muslim Aid.

Sudan's Ministry of Health with support from the Sudan Red Crescent have set up two clinics and are conducting health and nutrition screenings and medical consultations and referrals.

Since Saturday, UNHCR has so far relocated 2,500 refugees from the border to Um Raquba settlement site as renovation works continue. There is a critical need to identify more sites so that refugees can be relocated away from the border and can access assistance and services.

In Tigray in Ethiopia the lack of electricity, telecommunications and access to fuel and cash continue to severely hamper any humanitarian response. After nearly two weeks of conflict, reports of larger numbers of internally displaced grow daily, while the lack of access to those in need, coupled with the inability to move in goods to the region, remain major impediments to providing assistance.

UNHCR and partners are on standby to provide assistance to the displaced in Tigray, including basic items, when access and security allow.

The conflict is also a major ongoing concern for the Eritrean refugee population of nearly 100,000 in Tigray, who are reliant on assistance from UNHCR and partners. Potential for further displacement of refugees inside the country is increasingly a real possibility.

The humanitarian situation as result of this crisis is growing rapidly. UNHCR reiterates its call for peace and urge all parties to respect the safety and security for all civilians in Tigray.

Please find the link to the B-roll and photos that can be downloaded here: https://media.unhcr.org/Package/2CZ7A2KM3NMC

**For more information on this topic, please contact:**

- In Khartoum, Sophia Jessen, jessen@unhcr.org, +249 900 921 267
- In Nairobi, Dana Hughes, hughes@unhcr.org,  +254 733 440 536
- In Geneva, Babar Baloch, baloch@unhcr.org, +41 79 513 9549
- In New York, Kathryn Mahoney, mahoney@unhcr.org, +1 347 443 764

# Related news and stories

view more

VIDEOS

## Thousands flee fighting in Ethiopia, cross border to Sudan

NEWS RELEASES

## Humanitarian crisis deepens amid ongoing clashes in Ethiopia's Tigray region



**AP**     **AP Explains: Why Ethiopia is suddenly on...**     Top Stories    Topics ⌄   Video   Listen   🔍

ADVERTISEMENT



$24.99       $29.99       $69.99

🔖 Click to copy

**RELATED TOPICS**

International News

Virus Outbreak

AP Top News

Abiy Ahmed

Africa

Ethiopia

Civil wars

Kenya

# AP Explains: Why Ethiopia is suddenly on brink of civil war

By CARA ANNA     November 6, 2020



ADVERTISEMENT

NAIROBI, Kenya (AP) — Suddenly Ethiopia appears on the brink of civil war, threatening the stability of one of the world's most strategic regions, the Horn of Africa, and the fracturing of one of Africa's most powerful and populous countries.

But the crisis in Ethiopia, a key U.S. security ally, has been building for months. According to the deputy

**Trending on AP News**

**ID of man who found Rocky Mountains treasure chest revealed**

**Iran says US 'got the message' on tense exchanges in Gulf**

**Kim's sister slams Seoul for questioning zero-virus claim**

**AP**

**UK probing vaccine**

12/9/2020
Case 1:20-cv-03761-RBJ   Document 1   Filed 12/22/20   USDC Colorado   Page 71 of 86
AP Explains: Why Ethiopia is suddenly on brink of civil war

## AP Explains: Why Ethiopia is suddenly on...

Top Stories   Topics      Video   Listen

political leaders remain in prison.

**Full Coverage:** Ethiopia

WHAT DOES THIS MEAN BEYOND
ETHIOPIA?

Few regions are more vulnerable than
the Horn of Africa. Ethiopia's neighbors
include Somalia — Ethiopian forces
have reportedly begun withdrawing
from that country to return home —
and Sudan, facing its own huge political
transition. Neighboring Eritrea has
shown little sign of opening up after
making peace with Ethiopia in 2018, and
its government and the Tigray one don't
get along.

A region in which Abiy has played high-
profile peacemaker is now at risk.

Observers warn that a conflict could
suck in these countries and others not
far from the most strategic military
outpost in Africa, tiny Djibouti, where
several global powers including the U.S.
and China have their only military bases
on the continent. The Horn of Africa is
also a short water crossing away from
Yemen and the rest of the Arabian
Peninsula.

Ethiopia already was drawing concern
over a dispute with Egypt over a huge
dam Ethiopia is completing on the Blue
Nile. While there have been worries
about military action, "I would like to
think Egypt is a responsible enough
actor to realize that fragmentation of
Ethiopia is fundamentally so damaging
to regional security," former U.S.
diplomat Payton Knopf, a senior advisor
with the United States Institute of
Peace, said this week.

**AP**

UK probing
vaccine







"Heavy-duty fuel-cell vehicles are a critical part of the solution for a sustainable future."

Mark Russell, CEO, Nikola Corporation

WATCH THE VIDEO

# Ethiopia's internal conflict explained

The East African country has descended into an increasingly bloody civil conflict.



The unrest in Ethiopia threatens to engulf the Horn of Africa, with consequences for the EU as well | Eduardo Soteras/AFP via Getty Images

Wednesday, December 9, 2020

Editions ⌄　　Events ⌄

POLITICO

massive economic potential after Abiy released political prisoners, promised free elections and press freedom, welcomed exiled dissidents and allowed opposition groups once deemed terrorists to join the political spectrum.

The young prime minister fit hand in hand with the EU's pivot toward Africa, where its leaders hope to forge a more progressive relationship that gets away from traditional aid giving and colonial baggage. An unstable Ethiopia in the midst of a civil war that could destabilize the entire region would force a rethink of that strategy, at least in East Africa.

## What are the knock-on effects of the fighting?

More than 25,000 Ethiopian refugees have already fled the fighting to Sudan, where aid groups and the U.N. are now scrambling to provide services. Eritrea, which fought a war with Ethiopia from 1998 to 2000 that killed roughly 100,000 people, has already been drawn into the conflict. The TPLF leadership accuses Eritrea of fighting alongside the Ethiopian government, a claim the government denies, and over the weekend the TPLF confirmed it had fired three rockets toward the Eritrean capital Asmara, striking its international airport.

Ethiopian forces in Somalia — especially in the Gedo region in the south, which borders Ethiopia and Kenya — have abandoned their posts to be replaced by heavily armed special police from Ethiopia's Somali region. The recalling of Ethiopian forces "could create a security vacuum creating opportunities for [Islamist group] Al Shabaab," according to an internal EU document seen by POLITICO.

## What might be the broader consequences of more violence?

By some estimates as many as 100,000 people could flee Ethiopia over the next 12 months. Ethiopia's other regions — especially its largest, Oromia — have been prone to unrest since Abiy came to power due to ethnic rivalries and protests against the government. Violent protests after the June 29 killing of popular Oromo musician Hachalu Hundessa claimed about 200 lives. And inter-communal fighting in the western Benishangul-Gumuz region in September left at least 140 people dead. With federal soldiers having moved north to help with the fight against Tigray, these areas are left wide open to further instability.

Ethiopia's economy has already been slammed by the coronavirus pandemic, climatic shocks and locust plagues that have devastated farms. Further conflict can only add to an already chronic poverty rate and lead to further discontent.

## What does this mean for the EU's Africa pivot?

So far, official EU responses to the conflict have been muted. After a reported massacre of civilians in the Tigray region last week, the EU's Crisis Management Commissioner Janez Lenarčič told the German RND news network that there was a risk the violence could spread.

"I fear that this crisis will have catastrophic humanitarian impacts for the whole country," said Lenarčič. "The military escalation in Ethiopia threatens the stability of the whole country and the region."

✕

12/9/2020
Case 1:20-cv-03761-RBJ   Document 1   Filed 12/22/20   USDC Colorado   Page 74 of 86
Civilians in crossfire as Ethiopia descends into civil war - Los Angeles Times

ADVERTISEMENT

WORLD & NATION

# As Ethiopia descends into civil war, civilians by the thousands begin to stream out



Refugees from the Tigray region of Ethiopia wait to register at the United Nations High Commissioner for Refugees in Hamdayet, Sudan, on Nov. 14. (Marwan Ali / Associated Press)

By JACOB KUSHNER | SPECIAL CORRESPONDENT

NOV. 16, 2020 | 2:30 AM

# The backstory

Ethiopia is Africa's second-most populous nation, and its northern Tigray region was already home to some 100,000 internally displaced people and another 96,000 refugees from neighboring Eritrea — half of the nation's total, according to the UNHCR.

ADVERTISEMENT

Tigray's population of 6.5 million is predominantly farmers who grow wheat, barley, teff and sorghum, and raise cattle. Tourists sometimes pass through Tigray's eastern tip en route to visit the nearby Danakil Depression, which many geologists and meteorologists regard as both the lowest and hottest place on earth, reaching 410 feet below sea level and with recorded temperatures as high as 125 degrees.

Despite Tigrayans accounting for just 6% of Ethiopia's population, they dominated the nation's politics for nearly three decades until Ahmed, a member of the ruling coalition of Oromo ethnicity, was appointed prime minister. Within months he brokered peace with neighboring Eritrea to end a violent, two-decades-long standoff between the nations.

But Tigrayans balked after Ahmed dissolved the ruling coalition to form a new political party, dismissed all the Tigrayans from his Cabinet, and postponed national elections scheduled for August. In September, Tigray held elections anyway, against orders from the capital.

In early November, Ethiopia's Parliament labeled the TPLF a terrorist organization, complicating any attempt at negotiating peace. Ahmed said this month's airstrikes were in retaliation for attacks by the TPLF that sought to steal weaponry and equipment from Ethiopia's military and which left an unknown number of soldiers wounded and dead.

ADVERTISEMENT

"We know there's been federal aerial bombardment, but we don't know the exact targets or how successful it's been," said William Davidson, senior Ethiopia analyst for the International Crisis Group.

Power and water have been cut to the region's capital, Mekelle, home to nearly half a million people. Within hours of the airstrikes, reports surfaced that "a segment of the federal military was either forcefully taken over or defected to the Tigrayan side," Davidson said — as many as 15,000 soldiers, by some accounts.

On Friday the TPLF fired rockets at two airports in federal government-held territory and on Saturday at least three rockets were aimed at an airport in the capital of Eritrea in an attempt by the TPLF to rope Ethiopia's neighbor into the conflict. TPLF leadership has accused Eritrea, a longtime foe, of sending ground forces across the border to join the Ethiopian military in attacking Tigray.

Case 1:20-cv-03761-RBJ   Document 1   Filed 12/22/20   USDC Colorado   Page 76 of 86

Tens of thousands already have.

"They're not coming with a lot of possessions, and this is the worry," Axel Bisschop, a UNHCR representative in Sudan, told The Times on a call from Khartoum. "We are in need of everything — food, fresh water. We need to be prepared when it comes to COVID. We need more masks."

He said rough terrain will make it difficult for aid and personnel to reach the remote region, and that resources for the refugees were already in short supply.

"We don't have any place to house them. They're sleeping in the open," Bisschop said. He said it's crucial that a camp be established far enough from the border to protect refugees from spillover fighting. But right now, "our priority is to make sure that the border remains open."

ADVERTISEMENT

"We are urging governments in the neighboring countries to keep their borders open for people forced from their homes," said UNHCR Regional Bureau Director Clementine Nkweta-Salami. Refugee workers fear tens of thousands more people could flee if the conflict continues.

But Sudan can be a perilous place for ethnic minorities and people besieged by war. Its government has previously expelled humanitarian aid workers, nongovernmental organizations, human rights organizations and even UN officials.

Sudan's government was responsible for a genocide that began in Darfur in 2003 and for long-standing aerial bombardments in nearby Blue Nile state, some 200 miles away, contributing to the forced displacement of some 2.4 million Sudanese.

"That area is prone to refugees," Bisschop said — some 100,000 of them, according to the UNHCR. If precedent is any indication, the outlook for their swift and peaceful return to Ethiopia isn't good.

ADVERTISEMENT

"Eritrean refugees hosted there have been there for a very, very long time and are almost integrated into Sudan as such," he said.

The conflict will put an additional strain on the global humanitarian aid sector, already burdened by the COVID-19 pandemic and inundated with more refugees than ever before. If the conflict becomes entrenched and the refugees are unable to return home, many may set their sights on asylum and hope for resettlement abroad.

Currently more than 250,000 Ethiopian immigrants and their children live in the United States — more than from any other African country except Nigeria. More live in California than any other state, with at least 7,000 in the Los Angeles metropolitan area.

12/9/2020
Case 1:20-cv-03761-RBJ   Document 1   Filed 12/22/20   USDC Colorado   Page 77 of 86
Civilians in crossfire as Ethiopia descends into civil war - Los Angeles Times

Tolera cited rumors that Oromo and Tigrayan opposition forces — longtime enemies — are now joining forces against Ethiopia's military. "Anybody who comes to our home to take, we are ready to defend ourselves."

Despite reports that hundreds of soldiers from various sides have already been killed, experts worry it is Ethiopia's civilians who will bear the brunt of war, just as they did in the town of Mai-Kadra.

"Is this mass killing a precursor for how this is going to play out? We sincerely hope not, but we can see the potential for increased inter-communal conflict in that area if Tigrayans end up defending their land against attempted Amhara annexation," Davidson said, in reference to fears that ethnic or regional forces are taking advantage of the conflict to seize territory.

ADVERTISEMENT

"There is increasing concern for the protection of civilians against hostilities," the UN office that coordinates humanitarian assistance said in a statement. "Civilians caught in the crossfire always pay the price, especially children, women, elders and the disabled."

*Kushner is a special correspondent based in Nairobi. Reporting for this article was supported by a grant from the Pulitzer Center on Crisis Reporting.*

WORLD & NATION

---

⊒✉

### The Latinx experience chronicled

Get the Latinx Files newsletter for stories that capture the multitudes within our communities.

| Enter Email Address |
| :--- |

| SIGN ME UP |
| :---: |

You may occasionally receive promotional content from the Los Angeles Times.

| Jacob Kushner

---

MORE FROM THE LOS ANGELES TIMES

WORLD & NATION
**Infected after 5 minutes, from 20 feet away: South Korea study shows coronavirus' spread indoors**
39 minutes ago

1  Estifanos Daniel Ogbaselassie
2  A#: 097·938·145
3  Denver Contract Detention Facility
4  3130 N. Oakland street
5  Aurora, CO   80010
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    District of Colorado
10 Estifanos D. Ogbaselassie,              **Civil Action No.**
11 [A097·938·145           ],
12 **Petitioner,**
13         **v.**                           **MOTION FOR APPOINTMENT**
14 William P. Barr ,                        **OF COUNSEL PURSUANT TO**
15 **ATTORNEY GENERAL;**                    **18 U.S.C. § 3006A**
16 Chad Wolf                ,
17 **SECRETARY OF DEPARTMENT**
   **OF HOMELAND SECURITY;**
18 John Fabbricatore         , **U.S.**
   **ICE FIELD OFFICE DIRECTOR FOR**
19 **THE** Denver            **FIELD**
20 **OFFICE, and WARDEN OF**
   **IMMIGRATION DETENTION**
21 **FACILITY,**
22 **Respondents.**
23
24        Petitioner is a citizen of  Ethiopia        . Petitioner is in ICE custody in the
25 United States, but has been ordered removed to   Ethiopia       by an immigration
26 judge.  Petitioner's removal order is final, but Petitioner cannot be removed to
27
28

53

1   _Ethiopia_____, or any other country.  Thus, Petitioner remains indefinitely detained

2   in ICE custody, and has been confined for a period far longer than the law mandates.

3   Under 8 U.S.C. § 1231(a)(1)–(2), once an alien has been ordered removed, the Attorney

4   General must carry out the removal within a period of 90 days, during which time the alien

5   shall be detained.  The post-removal-period provision of the same statute, 8 U.S.C.

6   § 1231(a)(6), allows for certain aliens to be detained beyond the removal period, but the

7   Supreme Court explicitly limited this detention period in Zadvydas v. Davis, 533 U.S. 678

8   (2001).  In that case, the Court held that § 1231(a)(6) restricts an alien's post-removal-

9   period detention to a period reasonably necessary to bring about that alien's removal, and

10  that it "does not permit indefinite detention." Zadvydas, 533 U.S. at 689.  The Court found

11  that a presumption exists that an alien may not be held longer than six months; the general

12  rule is that an alien may no longer be confined when there is "no significant likelihood of

13  removal in the reasonably foreseeable future." Id. at 701.  In Clark v. Martinez, the

14  Supreme Court extended this holding to inadmissible aliens. 125 S. Ct. 716, 722 (2005).

15      The question as to whether Petitioner's detention is in violation of the laws of the

16  United States is one for a federal habeas court to hear. 28 U.S.C. § 2241.  Accordingly,

17  Petitioner files the accompanying habeas corpus petition, pursuant to 28 U.S.C. § 2241,

18  requesting that this Court order Petitioner's release.  I have no income or property

19  and therefore I cannot pay for a lawyer. I have asked my family

20  to help me pay for a lawyer but I was told that they couldn't afford it.

21  Therefore, Petitioner requests that this Court appoint counsel to represent Petitioner in

22  this habeas action.

23

24      **I.    The Court Should Exercise Its Discretion to Appoint Counsel**

25  Assuming that a Petitioner has shown financial need, a district court may appoint

26  counsel in a habeas proceeding under 28 U.S.C. § 2241 when the "interests of justice so

27  require."  18 U.S.C. § 3006A(a)(2)(B).  Courts have often examined three elements in

28                                          2

1  determining whether appointment of counsel is necessary: the likelihood of success on

2  the merits, the complexity of the legal issues involved in the case, and the ability of the

3  Petitioner to present the case in light of its complexity.  See, e.g., Weygandt v. Look, 718

4  F.2d 952, 954 (9th Cir. 1983); Saldina v. Thornburgh, 775 F.Supp. 507, 511 (D. Conn.

5  1991).  Petitioner has been held in custody for ___195 days___ since being ordered

6  removed to ___Ethiopia___, and removal in the reasonable foreseeable future

7  is unlikely because ___Ethiopia___ will not accept Petitioner.  Under the Supreme

8  Court's decision in Zadvydas, Petitioner's continued detention is presumptively

9  unreasonable.  Thus, Petitioner has a high likelihood of success on the merits.

10       Moreover, Petitioner would encounter great difficulty in presenting this habeas

11  corpus case alone.  The House Report on the predecessor to § 3006A(a)(2)(B) recognized

12  that habeas corpus proceedings often present "serious and complex issues of law and

13  fact" that would necessitate the assistance of counsel.  H.R. Rep. No. 1546, 91st Cong. 2d

14  Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 3982, 3993.  In addition, the congressional

15  report on § 3006A(2)(B) stated that a court *should* appoint counsel when "necessary to

16  insure a fair hearing."  Id.  The complexity of a habeas case will pose an especially great

17  obstacle for Petitioner. I only have a GED education and the complexity of

18  a Habeas and Immigration law is far beyond me. I would not be able

19  to effectively respond to ICE's defense without counsel.

20  In light of the complicated issues involved in habeas cases and Petitioner's inability to

21  adequately present the case at bar, as well as Petitioner's likelihood of success on the

22  merits, this Court should exercise its discretion to appoint counsel under 18 U.S.C.

23  3006A(a)(2)(B).

## II.  Appointment Of Counsel Is Necessary Because Discovery Is Imperative

The rules governing habeas proceedings require the appointment of counsel in certain circumstances.[36] Under Rule 6(a), 28 U.S.C. foll. § 2254, a judge must appoint counsel for a Petitioner if it is "necessary for effective utilization of discovery procedures." ICE has information and documents relevant to Petitioner's habeas petition, and without the assistance of counsel, Petitioner will not be able to effectively pursue discovery and, as a result, will not adequately present his claims. The aid of an attorney is especially important in this case, given Petitioner's lack of familiarity with the legal procedure involved in requesting and obtaining discovery. Moreover, even if Petitioner were to obtain documents in discovery, without the assistance of counsel, Petitioner would not be capable of analyzing them to determine his likelihood of being removed in the foreseeable future.

## III.  An Evidentiary or Motions Hearing May Be Necessary

Under Rule 8(c), 28 U.S.C. foll. § 2254, the court is required to appoint counsel in a habeas proceeding if an evidentiary hearing is needed. An evidentiary hearing will likely be necessary in this case. Regardless of any other issues, if an evidentiary hearing is scheduled, the court must appoint counsel for Petitioner.

For the above reasons, this Court should appoint counsel to assist Petitioner in instant habeas proceedings challenging Petitioner's detention by ICE, pursuant to the Supreme Court decisions in Zadvydas and Martinez.

Respectfully submitted,

Dated: 12.4.2020

Estifanos Daniel Ogbaselasse
Petitioner

---

[36] The rules cited in sections II and III typically govern those habeas corpus cases brought under § 2254. However, these rules may be applied to habeas cases that do not fall under § 2254 – such as those cases arising under § 2241 – at the discretion of the court. Rule 1(b), 28 U.S.C. foll. § 2254.

## CERTIFICATE OF SERVICE

I, Mikale Ogbaselassie, hereby certify that on 12-22-2020, I filed the foregoing with the Clerk of Court at:

Clerk of the Court
Alfred A. Arraj United States Courthouse
901 19th Street, Room A105
Denver, CO 80294-3589

I hereby certify that I have mailed a hard copy of the document to the individuals identified below pursuant to Fed.R.Civ.P. 4 via certified mail on [DATE].

12-22-2020

U.S. Attorney's Office
District of Colorado
1801 California Street, Ste. 1600
Denver, CO 80202

William Barr
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

And to: John Fabbricatore; Matthew Albence, and DHS/ICE, c/o:

Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, D.C. 20528

And to:

Johnny Choate
GEO Group, Inc.
3130 N. Oakland Street
Aurora, CO 80010

[SIGNED] Mikale Ogbaselassie
[NAME] 1350 Quari Street
Aurora, CO 80011
(720)-472-0309

niog5875@colorado.edu

1

# Table of Contents

1) Letter to the Clerk of the Court

2) Habeas Corpus Petition form

3) Habeas Corpus Petition full brief

4) Removal order from immigration Jude (Exhibit A)

5) 90 day custody review by ICE decision to continue detention (Exhibit B)

6) Summary of what is contained in Exhibit C

7) 180 day letter from ICE with decision to continue detention (Exhibit C)

8) Correspondence in the official manner with ICE about my case (Exhibit C)

9) Letter I wrote to ICE HQ requesting a Zaydvydas custody review (Exhibit C)

10) Letter signed and notarized from my father proving my ethnicity and my identifiers to my ethnicity (Exhibit D)

11) Letters leaked from Ethiopian govt. with official translation (Exhibit E)

12) Media Accounts to my country and the turmoil in govt. that I feel will further hinder the obtaining of travel documents. (Exhibit E)

13) Petition for appointment of Counsel

12/21/2020                    Estifanos D. Ogbaselassie

X _____                                    pro se

A 097-938-145

United States District Court for the District
of Colorado

Clerk of the Court,

Enclosed is my Petition for writ of Habeas Corpus pursuant to 28 U.S.C. §2241 (habeas corpus). I, (Estifanos Ogbaselassie) am appearing before the Court, Pro Se and would like to apologize in advance for the rudimentary appearance of my Writ. We have very limited resources, and are further hampered by the COVID-19 pandemic; Furthermore this is my first time ever filling a petition in any Court Pro-Se. I thank the Court in advance for considering my petition, and request for appointment of Counsel.

Estifanos Daniel Ogbaselassie - Pro Se
A#: 097938145

Date: 12/5/2020                    X _____

Estifanos Daniel Ogbaselassie
A#: 097-938-145
GEO Denver Contract Detention Facility
3130 North Oakland Street
Aurora, CO 80010

LEGAL MAIL

To: Clerk of the Court
Colorado District Court
Alfred A. Arraj United States Courthouse
901 19th Street
Room A105
Denver, CO 80294

Scanned by
US Marshal

